### *In re* MADDOX.

1. Habeas Corpus—Appeal—Commitment as a Criminal Sexual Psychopath—Presumptions.

The original commitment of an individual as a criminal sexual psychopath is presumed valid without a determination to that effect, where the issue of validity was not raised in the court from which the appeal was taken on the denial of a writ of habeas corpus, in the absence of either the petition for commitment or the record before the committing court (CL 1948, § 617.18).

2. Constitutional Law—Criminal Sexual Psychopath—Nature of Commitment Proceedings.

Proceedings for the commitment of an individual as a criminal sexual psychopath are not criminal in nature and, therefore, are not circumscribed by constitutional and statutory limitations surrounding a person accused of, or tried for, a crime (CL 1948, § 780.505, as amended).

3. Same—Public Safety—Criminal Sexual Psychopaths.

The act providing for the commitment of persons as criminal sexual psychopaths was designed for the protection of the public against persons who, while not insane or feeble-minded,

References for Points in Headnotes
[1–3, 6, 7] 28 Am Jur, Insane and Other Incompetent Persons § 29.
[2] 14 Am Jur, Criminal Law § 19.
[1–3, 7] Statutes relating to sexual psychopaths. 24 ALR2d 350.

are not to be classed as criminals nor subjected to punishment as such for acts resulting from the psychopathic condition or mental disorder, but are to be committed for treatment in a suitable institution of the State until the mental disorder is cured, or alleviated to such an extent as to permit the release of the one so detained without endangering the public safety or welfare (CL 1948, § 780.505, as amended).

4. PRISONS—CRIMINAL OFFENDERS—DUE PROCESS.

The State prison of Southern Michigan is the State's principal penitentiary for the imprisonment of criminal offenders found guilty of crimes and sentenced thereto in our criminal courts by due process of law (CL 1948, § 800.1).

5. SAME—COMMITMENT—MEDICAL DIAGNOSIS.

Incarceration in the State prison for Southern Michigan cannot constitutionally be based upon either medical diagnosis at a civil commitment proceeding or administrative decision of the State hospital commission after civil commitment.

6. SAME—COMMITMENT—CONSTITUTIONAL LAW.

Confinement in a penitentiary designed and used for the confinement of convicted criminals is not a prescription available upon medical diagnosis and order to an administrative branch of government as such confinement can be ordered only by a duly constituted court after trial conducted in accordance with the guaranties pertaining to individual liberty contained in the Constitutions of this State and the United States (US Const, Am 14; Mich Const 1908, art 2, §§ 13, 19).

7. SAME—COMMITMENT—TRANSFER OF CRIMINAL SEXUAL PSYCHOPATH FROM HOSPITAL.

Defendant, committed as a criminal sexual psychopath, who was transferred from the State hospital for the criminally insane to the State prison largely because certain police officers and certain doctors believed that he was guilty of criminal offenses to which he has never admitted nor of which he had ever been convicted *held*, to have been transferred pursuant to an order that is void.

Appeal from Jackson; Simpson (John), J. Submitted January 17, 1957. (Docket No. 79, Calendar No. 46,153.) Decided March 5, 1958.

Habeas corpus by Embra Maddox directed to warden of State Prison of Southern Michigan to

test validity of confinement as a criminal sexual psychopathic person. From dismissal of writ, petitioner appeals. Reversed and remanded.

*Robert Crary* and *Robert Crary, Jr.,* for petitioner.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Daniel J. O'Hara* and *Perry A. Maynard,* Assistants Attorney General, for the people.

Edwards, J. From a cell block in the State Prison of Southern Michigan, this Court received an application for writ of habeas corpus filed by defendant Maddox seeking to test the legality of his detention as a criminal sexual psychopathic person under commitment from Detroit recorder's court in said prison. Since prior to this date a similar application for writ of habeas corpus had been filed in the circuit court for the county of Jackson and there denied, this Court treated the petition as an application for leave to appeal from said denial, and on April 14, 1954, ordered

"that the order of the circuit court for the county of Jackson dismissing the petition for a writ of habeas corpus be, and the same is hereby vacated and set aside; * * * [and] that the cause be remanded to the circuit court * * * for a full and complete judicial inquiry into the questions of fact and law involved."

The hearing called for by this order was held, with the result that the circuit judge found from the testimony

"that the petitioner is getting treatment, and that the petitioner is properly being confined in the State prison of Southern Michigan."

The essence of the trial judge's finding, based on the testimony of several physicians, is as follows:

"All these men testified that the course of procedure on this petitioner is recognized treatment for a man with his difficulty; that one of the things that must be conveyed to the inmate is self-discipline; and they claim that that is part of the treatment. They claim that when an inmate is at Ionia and is what is known as an adamant patient the best thing that can be done with him is to transfer him to the State prison of Southern Michigan where he will have self-discipline, and also while there, has the advantage of the counseling department of the local institution together with psychiatric treatment, and also may have work or go to school, according to his capabilities. And all of these psychiatrists testified that this man, under the system employed, is getting treatment. They all testified that there was therapeutic treatment for the readjustment of his personal condition in allowing them to come to themselves with a desire to get well. When they do this they are transferred back to Ionia State hospital where they are then made an out-patient and have to report to one of the State institutions, for a few years to help them protect themselves."

On appeal, defendant, now represented by counsel, presents as his question:

"Does the confinement of the appellant in the State prison of Southern Michigan deprive him of his rights guaranteed by the Constitution of the State of Michigan, as well as the due process clause of the Fourteenth Amendment?"

The record with which we are confronted tells very little of the facts upon which defendant's commitment was originally based. The defendant contended in his testimony before the Jackson county circuit court in effect that his original commitment was due to the fact that he, a Negro, was married

to a white woman. How this was related, if indeed it was, to his commitment as a criminal sexual psychopath does not appear.

Apparently, however, no attack upon the original commitment was made in the court below or is addressed to us here. In the absence of the raising of this issue below and, in the absence of the petition and the record before the committing court, we presume without deciding that the commitment was valid. CL 1948, § 617.18 (Stat Ann § 27.866) ; *Floyd* v. *Roberts,* 331 Mich 687.

The issue which is squarely presented by this record is that of the constitutionality of defendant's present confinement in the State prison of Southern Michigan, under a commitment as a criminal sexual psychopath, under PA 1939, No 165, as amended by PA 1950 (Ex Sess), No 25 (CL 1948 and CLS 1952, § 780.501 *et seq.* [Stat Ann 1951 Cum Supp § 28.967 (1) *et seq.*]).

This Court has previously considered the statute referred to. In the first version adopted by the legislature in 1937 (PA 1937, No 196, § 1b [CLS 1937, § 17329–2, Stat Ann 1938 Cum Supp § 28.1073 (1)]), the act was held unconstitutional. *People* v. *Frontczak,* 286 Mich 51. Justice Wiest's opinion in *Frontczak* said, in part (p 59) :

"Hospitalization, with curative treatment and measures may be desirable but, until the law makes a sane person amenable to compulsory restraint as a sex deviator, it falls short of due process in merely providing procedure.

"Under this act defendant is under sentence for an overt sex deviation offense and, as a potential like offender, it is sought to keep him in confinement under exercise of the police power. The police power, under such circumstances, is not a civil proceeding, comparable to that in cases of insane persons.

"The mentioned amendment and addition do not fall within the title, unless constituted criminal procedure and, as such, violates the constitutional provision securing the rights of an accused. Const 1908, art 2, § 19."

Subsequent to the *Frontczak Case* in 1938, the previously-cited statute was passed in 1939. This Court upheld the constitutionality of the legislation in *People* v. *Chapman,* 301 Mich 584. Justice STARR, for a unanimous Court, held that the new form of the statute was a civil, rather than a criminal (p 604), proceeding and as such was constitutional. See, also, *Minnesota, ex rel. Pearson,* v. *Probate Court of Ramsey County,* 309 US 270 (60 S Ct 523, 84 L ed 744, 126 ALR 530).

Some attention was given to the problem of institutionalization under the statute in the *Chapman Case,* but the holding in the case on this point was (p 607): ·

"His detention in the Ionia State hospital does not warrant our declaring the statute unconstitutional or his commitment unlawful."

We are now confronted with a different factual situation arising under the same act. Defendant in this case, committed under date of May 11, 1952, was likewise sent to Ionia State hospital. On September 3, 1952, however, appellant was transferred to the State prison of Southern Michigan at Jackson where he has remained (except for 1 brief return to Ionia under order of this Court) and where the record now discloses him to be confined.

Defendant contends that he is incarcerated in the State prison of Southern Michigan under the control of the department of corrections, and under a prison discipline and routine which, with 2 exceptions, is identical with the discipline and routine imposed

upon prisoners sentenced under the criminal code of Michigan:

"*Q.* Now, were you treated differently at the prison than the other prisoners who were there for criminal offenses?

"*A.* Well, as far as I know, all the same. They talked to us. They told me they handled them the same.

"*Q.* How about the other inmates of Southern Michigan who didn't come from Ionia? Were you treated any differently from the ones who didn't come from Ionia?

"*A.* Yes.

"*Q.* How were you treated differently?

"*A.* Those boys gets out. They gets out, and they don't allow them in the place so long. Some stay quite a while, but they goes out, those does; not Ionia.

"*Q.* You don't get a chance to go out because you are from Ionia?

"*A.* Don't get out at all.

"*Q.* Is there any—

"*A.* (*Interrupting*) I mean not outside the wall.

"*Q.* Is there any other difference, other than the fact you don't go outside the walls?

"*A.* I was told they meant to keep all c.s.p.'s inside the wall. That's what I got from the counselor.

"*Q.* Did they do anything else different to the c.s.p.'s?

"*A.* Well, the c.s.p. they work. That's all I know. They work and, you know, work side by side. They sleep side by side even, inmates, and they all work side by side right together on the job every day. I work every day since I have been locked up. That's why I was in court. But ever since I had been out of quarantine, I never missed a meal or a day's work in Ionia or Jackson.

"*Q.* In other words, you sleep right next to prisoners confined for criminal reasons and work right beside them?

"*A*. That's right; side by side, and closed the door the same minute."

The exceptions noted are, first, that the criminal sexual psychopaths are never allowed outside the prison walls, and that at long intervals they are seen in brief visits by doctors from Ionia.

Much of the argument presented to us turns upon the question as to whether or not defendant on this record may be said to be receiving treatment "in an appropriate State institution" within the meaning of the statute, CL 1948, § 780.505, as amended by PA 1950 (Ex Sess), No 25 (Stat Ann 1951 Cum Supp § 28.967[5]). As noted, the circuit judge resolved this question in the affirmative on the basis of the testimony of 4 psychiatrists presented by the State. No contrary medical evidence was offered, and we must assume that their medical opinions are controlling for purposes of this case.

Each doctor testified, in effect, that, although he was not acquainted with the detail of prison routine, the incarceration and restraint imposed thereby was in and of itself a form of treatment which, at least on some occasions, helped to make obdurate criminal sexual psychopaths more ready to accept the treatment and assistance toward recovery offered by Ionia State hospital to which they might be returned. It is plain from the testimony of the medical superintendent of Ionia State hospital that he assumed no responsibility for plaintiff's care or treatment while in prison beyond the statutorily-required 6 months' interviews.

In effect, the doctors' testimony really stated that incarceration in prison under prison conditions was a medical prescription for the type of problems which defendant had been found to have. They argued that the prison incarceration prescribed served a useful purpose, and the circuit judge from their

testimony found that prison incarceration was recognized treatment for adamant criminal sexual psychopaths.

Our concern, however, is not with the correctness or incorrectness of the medical prescription. We are asked to pass on the constitutionality of defendant's imprisonment.

Other efforts to raise this identical issue have heretofore been before the courts. *In re Faint,* 341 Mich 408; *In re Kemmerer,* 309 Mich 313; *Rowan v. People* (CCA), 147 F2d 138; *Kemmerer v. Benson* (CCA), 165 F2d 702. In none of these instances, however, was the issue squarely passed upon by the courts, the latter 3 cases citing *Chapman, supra,* as to the general constitutionality of the criminal sexual psychopath act and referring defendant's complaint about *the place* of incarceration to another forum.

We now propose to decide the question of the constitutionality of the present defendant's confinement at the State prison of Southern Michigan.

The reason for our Court having previous to this time held that the criminal sexual psychopath act was constitutional was solely because it was interpreted as a civil and noncriminal proceeding. The origin and history of the act makes plain that this was its intention. The purpose may be traced from Justice WIEST's language in *Frontczak, supra,* wherein he held a criminal statute unconstitutional, through the work of the Governor's study commission on the Deviated Criminal Sex Offender (See Report to the Committee on Education of the Governor's Study Commission on the Deviated Criminal Sex Offender [1950], and Report of the Governor's Study Commission on the Deviated Criminal Sex Offender [1951]), to the language of the act itself calling for a person found to be a criminal sexual psychopathic person "to be confined in an appro-

priate State institution under the jurisdiction of
either the State hospital commission or the depart-
ment of corrections until the superintendent of the
institution shall have reasonable grounds to believe
that such person has recovered from such psycho-
pathy." CL 1948, § 780.505, as amended (Stat Ann
1951 Cum Supp § 28.967[5]).*

In the *Chapman Case, supra,* Justice STARR gave
his rationale for upholding the constitutionality of
the act, as follows (pp 602, 603):

"We are satisfied that the present statute is dis-
tinguishable and contains none of the constitutional
infirmities of the previous statute relating to sex
deviators, which was held unconstitutional in the
*Frontczak Case.* The statute involved in such case
was, as stated in the majority opinion, placed in the
criminal-code chapter relating to judgments and sen-
tences in criminal cases. The present statute is not
contained in either the code of criminal procedure
or the penal code. It makes sex deviators subject
to restraint because of their acts and condition, and
not because of conviction and sentence for a crim-
inal offense. It does not extend or impose an added
or different sentence under the guise of hospitaliza-
tion. The procedure under this statute resembles
a statutory inquest for the commitment of an insane
person accused of a felony. (CL 1929, § 17241 [Stat
Ann § 28.967].) Proceedings under the present stat-
ute are not criminal in nature and, therefore, are
not circumscribed by the constitutional and statu-
tory limitations surrounding a person accused of,
or tried for, a crime. *People* v. *Janek,* 287 Mich
563; *In re Liggett,* 187 Cal 428 (202 P 660); *In re
Bresee,* 82 Iowa 573 (48 NW 991)."

In an even more recent case, *People* v. *Piasecki,*
333 Mich 122, 142, Justice CARR spelled out the pur-
pose of the statute, as follows:

---

* For later amendment, see PA 1952, No 58.—REPORTER.

"By the adoption of the act here in question the legislature sought to provide for the protection of the public against persons who, while not insane or feeble-minded, present a serious problem. The method prescribed for the care and treatment of such persons rests on the theory that because of their mental condition they should not be classed as criminals in the ordinary sense of the term, nor subjected to punishment as such for acts resulting from the psychopathic condition or mental disorder. In keeping with such conclusion a method of inquiry, wholly separate and apart from proceedings under the criminal law of the State, was prescribed for determining the situation with reference to the existence of the psychopathy in question on the part of one accused of a criminal act, with further provision for commitment and treatment in a suitable institution of the State until the mental disorder is cured, or alleviated to such an extent as to permit the release of the one so detained without endangering the public safety or welfare."

Clearly then, in design and purpose and interpretation, we have a statute which purports to represent civil commitment for treatment due to a mental state or condition. And our courts have upheld the civil and noncriminal procedures of the statute in direct relationship to its stated purpose and to the treatment contemplated.

The hard fact posed by our current case is, that we are faced by a record which shows that a person committed under this remedial and corrective legislation for hospitalization and treatment is, in fact, serving potentially a life sentence in our biggest State prison, treated in all respects similarly to other criminals therein confined.

The State prison of Southern Michigan is the State's principal penitentiary for the imprisonment of criminal offenders found guilty of crimes and sentenced thereto in our criminal courts by due process

of law. CL 1948, § 800.1 (Stat Ann 1954 Rev § 28.1371).

Among the rights of a citizen of Michigan which must be observed prior to depriving him of his liberty by prison sentence are those recited in the Michigan Constitution (1908), art 2, §§ 13 and 19:

"Sec. 13. The right of trial by jury shall remain, but shall be deemed to be waived in all civil cases unless demanded by one of the parties in such manner as shall be prescribed by law."

"Sec. 19. In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury, which may consist of less than 12 men in all courts not of record; to be informed of the nature of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to have the assistance of counsel for his defense; and in courts of record, when the trial court shall so order, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal."

These provisions parallel, in our State Constitution, the rights reserved to citizens of the United States by the Sixth Amendment to the United States Constitution.

These provisions guarantee to every person charged with crime the right to a jury trial of the issue of guilt or innocence, wherein he is accorded a presumption of innocence and the benefit of a reasonable doubt. In this proceeding, as we have noted, no jury trial of the issue of guilt or innocence of a criminal charge is involved.

As far as the record before us discloses, this prisoner has never been tried and convicted of any crime. He certainly is not held in prison as a result of criminal conviction. Although the statute under which he was subjected to civil commitment

required a petition charging him with criminal acts, it permits commitment where "it shall appear that such person is a criminal sexual psychopathic person." In short, it allows for commitment on medical diagnosis, without any finding of guilt of commission of any crime.

We are confronted here by a record that plainly shows that a life sentence in State prison, based solely on medical diagnosis, can result from the administrative interpretations placed upon the act. And this, without the person concerned ever having been found guilty of any crime.

We reject any such interpretation of the statute.

We believe that incarceration in the State prison of Southern Michigan cannot constitutionally be based upon either medical diagnosis at a civil commitment proceeding, or administrative decision of the State hospital commission after civil commitment.

This Court holds that incarceration in a penitentiary designed and used for the confinement of convicted criminals is not a prescription available upon medical diagnosis and order to an administrative branch of government. Such confinement can only be ordered by a duly constituted court after trial conducted in accordance with the guaranties pertaining to individual liberty contained in the Constitution of this State and this nation. This prisoner has been denied the constitutional rights guaranteed Michigan citizens prior to sentence as a criminal offender. Const (1908), art 2, §§ 13, 19. This prisoner has been denied the due process of law pertaining to criminal trial to which he was entitled before penitentiary sentence or confinement. United States Constitution, Am 14.

While what we have said decides the constitutional issue posed by this case, we note that the violations of defendant's constitutional rights may well

have had an important practical effect upon his treatment and rehabilitation also. Defendant was committed because of a petition alleging certain criminal offenses and a medical diagnosis of a state or condition of sexual psychopathy.

The record, however, makes clear that he was transferred from Ionia State hospital to the State prison of Southern Michigan largely because he was "adamant" in refusing to admit the sex offenses with which he had been charged. The State psychiatrist in charge of his case, who recommended against his return to Ionia, indicated clearly in his testimony that defendant's refusal to admit his guilt of the offenses charged, *but of which he had never been found guilty,* constituted a major part of the reason for his being held at the State prison of Southern Michigan:

"*Q.* Doctor, you said that this man has refused to accept and admit his deviation, is that right?

"*A.* Yes, sir.

"*Q.* Now, part of your analysis of this man is based upon the history which you have been given of this man, and his answers to you, yourself, about his past history.

"*A.* No. I made that history direct from him except for the report of previous arrests.

"*Q.* You said his story as to the manner of his arrest in Detroit on the last occasion was not in accord with the police report, is that right?

"*A.* Yes, sir.

"*Q.* Does that have any significance for you?

"*A.* Yes, it does, because he doesn't accept, see? He says that his motive was different for going up there, see? * * *

"*Q.* Well, what did you go by in his history or story of his arrest as showing a failure to accept?

"*A.* He was committed to our hospital as a criminal sexual psychopathic person. That, in itself, means that he committed some overt sexual act.
* * *

"*Q.* Do you base part of the failure of acceptance on the refusal of the defendant here, to admit to an overt sexual deviated act?

"*A.* At any time, yes, sir, in all his life.

"*Q.* And you ascribe part of that to his failure to admit the circumstances as set forth to you on his most recent arrest?    *    *    *

"*A.* Yes.

"*Q.* In other words, part of your psychiatric analysis of this man is based upon what you were told in the police report and the variations from the story given you by the defendant, is that right?

"*A.* We have to take something. He doesn't come to us voluntarily.

"*Q.* Just answer that yes or no. I think your answer is yes, is that right?

"*A.* Yes."

It is obvious from the above that the practical result in this case is that defendant is now held in this State's principal prison for the confinement of criminal offenders largely because he refuses to admit that he is guilty of certain sex crimes with which he was charged before Detroit's recorder's court, but of which he has never been found guilty either by plea or trial. In short, defendant on this record is shown to be confined in a penitentiary largely because certain police officers and certain doctors believe that he was guilty of criminal offenses to which he has never admitted, and as to which he has been denied a jury trial. In the event that defendant were actually innocent of the offenses charged (and on this record we have no right to presume the contrary), his right to proper medical treatment would have been as badly violated by his imprisonment as his constitutional rights.

The constitutional problem posed by transfer to a penal institution of a person committed under

civil procedures for treatment has recently been before the Federal courts and decided in a well-considered opinion by Chief Judge Bolitha Laws, of the United States district court for the District of Columbia. In the case involved, Judge Laws was dealing with a juvenile committed through civil, noncriminal juvenile court proceedings for correctional treatment, but subsequently proposed to be transferred to a Federal institution employed for the incarceration of criminal offenders. The court concluded that the proposed transfer violated both the Constitution and the statute under which the youth had been committed. In reasoning, this closely parallels the situation with which we are here confronted. *White* v. *Reid,* 126 F Supp 867.

Throughout prior court considerations of this problem has run a thread of concern for the practical problem posed by available institutions. Although no specific showing was attempted upon this record in any detail, we assume that plainly suitable institutions, for the handling of persons committed in civil proceedings under the criminal sexual psychopath act, operated by the State hospital commission are crowded. This may well require court concern in the interest of public safety as to the timing of transfers affected by any similar habeas corpus proceedings. It cannot affect the basic constitutional rights of people.

The order by which the plaintiff is assigned to the State prison of Southern Michigan is void. In the alternative of his return within 1 month to "an appropriate State institution," for the purposes described, an order for release may be presented to the court below.

The judgment of the circuit court is reversed and its order dismissing the writ of habeas corpus is

vacated. The case is remanded for the entry of an order in accordance with this opinion.

DETHMERS, C. J., and CARR, KELLY, BLACK, and VOELKER, JJ., concurred.

SMITH, J., did not sit.

KAVANAGH, J., took no part in the decision of this case.