[Crim. No. 16818. In Bank. May 15, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
CHESTER C. FEAGLEY, Defendant and Appellant.

340

**Counsel**

Stephen L. Katz, under appointment by the Supreme Court, and Alfonso J. Moresi for Defendant and Appellant.

Jerome B. Falk, Jr., Charles C. Marson, William Higham and Rose Elizabeth Bird as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Herbert L. Ashby, Chief Assistant Attorneys General, William E. James, Assistant Attorney, Edward P. O'Brien, W. Eric Collins and Joyce F. Nedde, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—In *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], we held that the cruel or unusual punishment clause of the California Constitution prohibits the state from confining a nonviolent sexual offender in prison for a wholly indeterminate period which may extend to the end of his life. In the case at bar we are called upon to decide whether the state may achieve essentially the same result by the device of declaring the person to be a "mentally disordered sex offender" and "civilly" committing him for an indefinite period to an "institutional unit" on the grounds of a prison. We conclude that such confinement is likewise unconstitutional, both because of its undeniable prison setting and because of the admitted lack of treatment provided to those so detained.

Preliminarily we hold that as in *People* v. *Burnick, ante,* p. 306 [121 Cal. Rptr. 448, 535 P.2d 352], an alleged mentally disordered sex offender is entitled to the safeguard of proof beyond a reasonable doubt, and that the statutory denial of a unanimous verdict on the question whether he is such an offender violates the due process and jury trial provisions of the California Constitution and the equal protection clauses of both the state and federal Constitutions.

On the afternoon of October 25, 1969, Julie and Dena, two eight-year-old girls, were riding their bicycles in front of Julie's house in Menlo Park. Defendant Feagley, who worked as a maintenance man in the area, stopped to talk with them. He asked Julie if she was going to let her hair grow long, and she replied that she was. He then briefly stroked both girls' hair and the back of their necks. After watching Dena show him how fast she could ride her bicycle, he left. That is all that happened.

`Nevertheless, when the girls told their parents of the incident the latter called the police, and Feagley was arrested and charged with "molesting" each girl in violation of Penal Code section 647a. These charges were dismissed, however, when he entered a plea of guilty to one count of simple battery (Pen. Code, § 242), a misdemeanor stipulated to be a lesser included offense. The punishment prescribed for that offense is a fine not exceeding $1,000 and/or a term of six months' imprisonment in county jail. (Pen. Code, § 243.)

But a far worse fate awaited Feagley. Investigation disclosed—as he freely admitted, moreover—that the incident was not the first of its kind. Throughout his life Feagley has periodically experienced a compulsive need to stroke a woman's hair. On such occasions he has satisfied that need by discreetly approaching girls or young women in public places and caressing or combing their hair, sometimes snipping off a lock with a pair of scissors. Although he has acted without permission, at no time has he used force or threat of force to accomplish his purpose. Yet because of that state of mind and his nonviolent conduct associated with it, Feagley has been confined in California mental hospitals and state prisons for approximately 19 out of the last 33 years of his life.

Only the most recent of these commitments, of course, is before us now. On the basis of the foregoing investigation the court adjourned the criminal proceedings prior to sentencing and instituted the statutory procedure for determining if Feagley was a "mentally disordered sex offender," and if so, what should be done with him. (Welf. & Inst. Code, § 6300 et seq.)[1] For present purposes it is not necessary to review the many steps in that procedure.[2] Nor need we review the evidence in detail. It is enough to observe that at the several court hearings and the jury trial on this issue the expert testimony was closely balanced and in

---

[1]Section 6300 defines a mentally disordered sex offender as "any person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." The earlier statutory term for such a person was "sexual psychopath." (See former § 5500.)

Unless otherwise specified, all statutory references in this opinion are to the Welfare and Institutions Code.

[2]If the statutory mechanism discussed in this opinion appears excessively complicated, it is because the Legislature has chosen to make it so. As Presiding Justice G. A. Brown observed, "The statutory scheme prescribes a ponderous labyrinthian procedure for the disposition of a person found to be an M.D.S.O. An M.D.S.O. may be moved back and forth, yo-yo-like, amongst the committing court, the state hospital (under the Department of Mental Hygiene), the criminal court and a state penal institution (under the Department of Corrections)." (*People v. Allen* (1973) 29 Cal.App.3d 932, 935 [106 Cal.Rptr. 43].) As will appear, it may well be wondered whether the trip is really necessary.

sharp conflict: in each instance one or more reputable medical witnesses testified that Feagley was a mentally disordered sex offender and posed potential dangers to the public in the form of either psychological trauma or impulsive physical injury, while an equal number of no less reputable medical witnesses testified that although Feagley had a personality defect he was not a mentally disordered sex offender within the meaning of the statute and did not present any significant risk of harm to society. In these circumstances it is not surprising that the jury was likewise deeply divided: applying the "civil" standard of proof by a preponderance of the evidence, the jurors found that Feagley was a mentally disordered sex offender by a vote of only nine to three.

On one important issue, however, the experts were in full agreement—that in the present state of medical knowledge there is no treatment that will cure or even ameliorate Feagley's condition. Thus one of the two physicians who examined Feagley at the outset of the proceedings reported to the court, "This man has spent many years in institutions for similar offenses and I doubt very much whether he is amenable to psychiatric treatment." The other examining physician concurred, stating that "I further doubt the possibility of permanent change at this point in Mr. Feagley's life." At the first court hearing on the question both doctors testified unequivocally that Feagley was not amenable to treatment. This prognostication was confirmed by the medical director of Atascadero State Hospital, to whose institution Feagley was thereafter temporarily committed for observation and diagnosis (former § 6316): the Atascadero report advised the court, inter alia, that Feagley "will not benefit by care or treatment in a state hospital" and "This man cannot utilize treatment. . . ."

On the basis of the foregoing testimony and reports the court found "that the defendant is a mentally disordered sex offender who will not benefit by care or treatment in a state hospital and that the defendant is a danger to the health and safety of others. . . ." ■ The court thereupon ordered that Feagley be committed for an indefinite period to the Department of Mental Hygiene[3] "pursuant to Sections 6316 and 6326, Welfare & Institutions Code," and specifically directed that he be delivered into the custody of the superintendent of the California Medical Facility at Vacaville. It is from this order that Feagley prosecutes the present appeal. (Pen. Code, § 1237, subd. 1.)

[3] As of July 1, 1973, all references in the mentally disordered sex offender statutes to "Department of Mental Hygiene" were changed to "State Department of Health." In this opinion we shall continue to use the appellation in force at the time of the commitment proceedings in question.

At the outset we pause to note that the case is not moot. After we granted a hearing in this case Feagley was declared to be no longer a danger to the health and safety of others and was returned to the trial court, which placed him on probation on the criminal charge and ordered his release. In *People* v. *Succop* (1967) 67 Cal.2d 785, 790 [63 Cal.Rptr. 569, 433 P.2d 473], we held that even a temporary commitment as an apparent mentally disordered sex offender may be challenged after discharge, reasoning in part that "defendant is entitled to the opportunity to clear his name of the adjudication that he is a probable mentally disordered sex offender." (Accord, *People* v. *Harvath* (1969) 1 Cal.App.3d 521, 526 [82 Cal.Rptr. 48]; *People* v. *Slutts* (1968) 259 Cal.App.2d 886, 895 [66 Cal.Rptr. 862].) A fortiori is this true of an indefinite commitment finding the defendant to be an actual mentally disordered sex offender. In addition, the "substantial legal disabilities" (*In re Bevill* (1968) 68 Cal.2d 854, 860 [69 Cal.Rptr. 599, 442 P.2d 679]) flowing from that finding are not all lifted by discharge from the commitment: for example, such a person continues to be subject to the burden of registering as a "sex offender" each time he moves from one city or county to another. (Pen. Code, § 290.)[4] Finally, the finding and order of commitment in Feagley's case are far from unique, and "we cannot be oblivious to the importance of the constitutional issue posed nor the number of persons who are affected." (*In re Ballay* (1973) 482 F.2d 648, 651 [157 App.D.C. 59].)

We therefore address the merits of the appeal.

I

■ We first reaffirm our holding in *People* v. *Burnick, supra, ante,* page 306, that the standard of proof beyond a reasonable doubt is required in mentally disordered sex offender proceedings by the California and federal due process clauses. (Cal. Const., art. I, § 7, subd. (a); U.S. Const., 14th Amend.) We shall not repeat that analysis here, but shall show that it applies even more compellingly to a person in Feagley's class.

---

[4] Indeed, in this regard mentally disordered sex offenders, however minor their underlying crime, may be worse off than persons who are required to so register by reason of conviction of violent sexual felonies such as assault with intent to commit rape or sodomy. Penal Code section 290.5 relieves the latter of the duty to register upon obtaining a certificate of rehabilitation pursuant to Penal Code section 4852.01 et seq. That section, however, applies only to felons; it is silent on whether mentally disordered sex offenders can take advantage of its provisions, and the silence arguably implies their exclusion.

The California statutory scheme divides mentally disordered sex offenders into two sharply differentiated categories—those who can and those who cannot "benefit by treatment in a state hospital." (§ 6316.) The latter are not confined in a hospital but in a "state institution or institutional unit" provided pursuant to section 6326. It is essential to understand the significance of that phrase. The distinction between "state hospital" and "state institution or institutional unit" runs throughout the provisions of the statutes dealing with the commitment of mentally disordered sex offenders, the review of their condition, and their discharge from the program. (§§ 6316-6330.) It must, accordingly, be viewed as deliberate.

A "state hospital" is not further defined in the mentally disordered sex offender law, but elsewhere in the code a number of such hospitals are listed and their function is stated to be "the care and treatment of the mentally disordered." (§ 7200.) They are, in short, the traditional state mental health hospitals. Of these, it is to Atascadero State Hospital in San Luis Obispo County that virtually all persons found to be mentally disordered sex offenders amenable to treatment are committed. Such a person was the defendant in *People* v. *Burnick, supra, ante,* page 306.

A "state institution or institutional unit," by contrast, is not a hospital. As used in the mentally disordered sex offender law, it is a term of art. An "institutional unit" is defined in broad terms by paragraph 3 of section 6326: "The Director of Mental Hygiene, with the approval of the Director of Corrections and the Director of Finance, may provide on the grounds of a state institution or institutions under the jurisdiction of the Department of Corrections or the Department of Mental Hygiene one or more institutional units to be used for the custodial care and treatment of mentally disordered sex offenders." In practice, mentally disordered sex offenders who are committed or recommitted to an "institutional unit" are confined on the grounds of a prison facility under the jurisdiction of the Director of Corrections. Although a number of such facilities exist (Pen. Code, § 5003), the majority of persons found to be mentally disordered sex offenders not amenable to treatment are confined in the California Men's Colony in San Luis Obispo County.[5] The California

---

[5]Persons in this category are "processed in" at the California Institution for Men at Chino and the California Medical Facility at Vacaville. Some are retained at the latter location, and "cases requiring management control or security housing . . . may be housed at San Quentin." (Inmate Classification Manual (Dept. Corrections) p. CL-VII-02.) (For an example of the latter confinement, see *In re Lopez* (1969) 1 Cal.App.3d 683 [82 Cal.Rptr. 129].) As noted above, Feagley was ordered delivered to the California Medical Facility, but his records show he was transferred shortly thereafter to the California Men's Colony and was confined therein for the bulk of his commitment.

Men's Colony is a medium security state prison. (Pen. Code, § 2046 et seq.)

Surely the loss of freedom suffered by confinement in a unit within the walls of a state prison is even greater than the restrictions accompanying placement in a state hospital. Surely also the odium resulting from imprisonment in the California Men's Colony is even graver than the impairment of "good name" following commitment to Atascadero. The rationale of *Burnick* therefore applies a fortiori to the case at bar: the dual consequences of curtailment of liberty and moral stigma which attached to Feagley's commitment were so serious that he was entitled to the due process safeguard of proof beyond a reasonable doubt of each of the two operative facts resulting in his confinement in the California Men's Colony, i.e., that he was a mentally disordered sex offender and that he could not "benefit by treatment in a state hospital." (See *In re Winship* (1970) 397 U.S. 358, 363-367 [25 L.Ed.2d 368, 374-377, 90 S.Ct. 1068]; *Specht* v. *Patterson* (1967) 386 U.S. 605, 608-610 [18 L.Ed.2d 326, 329-330, 87 S.Ct. 1209].)

## II

Contrary to the assumption of the People throughout these proceedings, a person in Feagley's class—i.e., who is committed to an "institutional unit" on the grounds of a state prison—has no *statutory* right to a jury trial as a means of reviewing the original order of commitment. Section 6318, the sole provision authorizing such trials, applies by its terms only to a person who is found to be a treatable mentally disordered sex offender and hence is placed "in a state hospital," thus excluding by negative implication all those who are committed instead to an "institutional unit."[6] Nor is there any chance the limitation written into section 6318 is a legislative oversight, as its companion sections are identically limited. Thus pending the trial section 6319 authorizes a stay of all commitment proceedings for placement "in a state hospital." Section 6321 prescribes the conduct of the trial, and provides that if the jury finds the person is a mentally disordered sex offender the court shall make "an order similar to the

---

[6]Section 6318 provides in relevant part: "If a person ordered under Section 6316 to be committed as a mentally disordered sex offender to the department *for placement in a state hospital* for care and treatment, or any friend in his behalf, is dissatisfied with the order of the judge so committing him, he may, within 15 days after the making of such order, demand that the question of his being a mentally disordered sex offender be tried by a judge or by a jury in the superior court of the county in which he was committed." (Italics added.)

original order for commitment to the department for placement in a state hospital." And the same restriction appears in sections 6322 (execution of writ of commitment) and 6323 (delivery of commitment documents).

This selective denial of a jury trial is perhaps the most glaring example of legislative discrimination against those mentally disordered sex offenders who are committed to an "institutional unit" rather than a state hospital.[7] Nevertheless, the unconstitutionality of the jury trial distinction under both the California and federal equal protection clauses is so obvious (see e.g., *In re Gary W.* (1971) 5 Cal.3d 296, 304-307 [96 Cal.Rptr. 1, 486 P.2d 1201]; *Baxstrom* v. *Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760]) that the People do not attempt to defend or enforce it. Feagley was therefore given such a trial despite section 6318 and in obedience to the constitutional mandate of equal protection of the law. (*People* v. *Washington* (1969) 269 Cal.App.2d 246, 251 [74 Cal.Rptr. 823].)

Some protection, however, is more equal than others. Under the Legislature's rules of the game, two strikes were called against Feagley before the jury even began to deliberate. At the outset of the trial the prosecutor stressed that the sole question to be submitted to the jury under the terms of section 6318 was whether Feagley was a mentally disordered sex offender.[8] The court agreed, and ruled that no evidence would be admitted on the issue of whether Feagley could "benefit by treatment in state hospital." Feagley's counsel called this ruling "unduly restrictive," but objected in vain. Thus although Feagley's initial commitment to an "institutional unit" was predicated under section 6316 on the court's findings on two distinct issues—was he a mentally disordered sex offender? If so, could he benefit by treatment in a state hospital?—he was permitted to challenge only one of those equally crucial determinations at his jury trial.

---

[7]There are other examples. The Legislature also declined to extend to such persons the benefits of the trial court's statutory authorization to require periodic progress reports from the institution to which the defendant is committed (§ 6317) and, after reception at the institution, to conduct a new hearing as often as every six months for the purpose of reviewing the factual justification for his continued confinement (§ 6327). The absence of statutory provisions for judicial review of the cases of defendants committed to such units demonstrates beyond cavil that they are the forgotten men of this legislative scheme.

[8]Section 6318 provides in relevant part: "The court shall adjudge whether the person is a mentally disordered sex offender, or if it is a trial by jury the judge shall submit to the jury the question: Is the person a mentally disordered sex offender?" This is further proof that section 6318 was intended to apply only to persons committed to a state hospital.

The prosecutor also relied on the fact that under former section 6316 Feagley had been sent to Atascadero for a 90-day period of observation and diagnosis and had been certified by that institution as not amenable to treatment in a state hospital. In such circumstances it was said to be the rule that the only issue at the jury trial "would be whether defendant is an MDSO, since the question whether he is amenable to hospital treatment is for the sole determination of the hospital authorities." (*People* v. *Washington* (1969) *supra,* 269 Cal.App.2d 246, 252, fn. 3.) On the very day of Feagley's jury trial, however, legislation took effect which eliminated the 90-day Atascadero observation placement from the mentally disordered sex offender law. (Stats. 1970, ch. 685, § 3, p. 1313.) Since that date the trial courts have had no guidance other than the often conclusionary testimony at the commitment hearing on the critical issue of whether the person could benefit from treatment in a state hospital; and even that testimony is no longer based on three months of institutional study, but typically on a prehearing conversation of an hour or less in county jail.[9] Nor have the trial courts any statutory standard for resolving this issue: while the definition of "mentally disordered sex offender" in section 6300 (fn. 1, *ante*) is imprecise (see *People* v. *Burnick, supra, ante,* pp. 328-329, fn. 20), there is no standard whatever for determining when a defendant can or cannot "benefit by treatment in a state hospital." The possibilities of error are therefore manifest, and mandate the safeguard of a jury trial of the issue.

The second setback came at the close of the trial. Feagley submitted an instruction which would have informed the jury that in order to reach a verdict "all twelve jurors must agree to the decision." The court refused to give the instruction, and instead told the jury that "As this proceeding is governed by the laws relating to civil actions, a verdict may be delivered upon agreement of three-fourths of your number. . . ." As noted above, the verdict finding Feagley to be a mentally disordered sex offender was agreed to by the bare minimum vote of nine jurors to three.

The court's authorization for its instruction was section 6321, which provides in relevant part that "if tried before a jury the person shall be discharged unless a verdict that he is a mentally disordered sex offender is found by at least three-fourths of the jury." ■ We hold that the

---

[9]For example, in *People* v. *Burnick, supra, ante,* page 306, the People's expert witness interviewed the defendant for "a half hour or so," and testified this was "the usual procedure" in preparing for a mentally disordered sex offender hearing. Taken together, the three psychiatrists in that case examined the defendant for an average of 43 *minutes* each.

statute—which applies to all mentally disordered sex offenders who demand a jury trial—is unconstitutional on two grounds.

First, it violates the provisions of the California Constitution guaranteeing due process of law (art. I, § 7, subd. (a)) and a unanimous jury verdict (art. I, § 16).[10] It is true that neither of the cited provisions applies by its terms to "civil" actions. But "the California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*In re Gary W.* (1971) *supra,* 5 Cal.3d 296, 307.) Moreover, the mentally disordered sex offender proceeding here challenged has all the trappings of a criminal prosecution, together with the worst consequences of the latter.

Thus at the trial level the proceeding was entitled "The People of the State of California vs. Chester Cummings Feagley, Defendant"; it was assigned to the criminal docket, and was heard by a judge of the criminal division of the superior court. The case against Feagley was presented by the district attorney. (§§ 6320, 6329.) Feagley was entitled to be present at the hearing (§ 6314), to have court-appointed counsel or the services of the public defender (*id.;* see also § 6305), and to compel the attendance of witnesses by subpoena (§ 6313); all such witnesses were "entitled to the same fees and expenses as in criminal cases, to be paid upon the same conditions and in like manner." *(Id.)* And pending determination of the issue Feagley had the right to be released on bail. (*In re Keddy* (1951) 105 Cal.App.2d 215, 218-221 [233 P.2d 159].)

Similar indicia of the true nature of this proceeding appeared at the appellate level. Both in the Court of Appeal and in this court the case retained its "criminal" title and was given new "criminal" docket numbers. At Feagley's request, counsel was appointed to represent him on appeal, to be paid by the courts. And the entire cost of the transcripts of the proceedings below was paid by the county.

---

[10]*Johnson* v. *Louisiana* (1972) 406 U.S. 356 [32 L.Ed.2d 152, 92 S.Ct. 1620], and *Apodaca* v. *Oregon* (1972) 406 U.S. 404 [32 L.Ed.2d 184, 92 S.Ct. 1628], are not controlling on this issue. They declare that the states are not *compelled* by the Sixth and Fourteenth Amendments to provide for jury unanimity in criminal trials; neither decision, however, *prohibits* the states from imposing that requirement, as the vast majority do by Constitution or statute. Article I, section 16, of the California Constitution recites in relevant part that "Trial by jury is an inviolate right and shall be secured to all, but in a civil cause three-fourths of the jury may render a verdict." By implication, of course, in criminal actions section 16 requires jury unanimity. (*People* v. *Superior Court* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143].)

The authority for the latter payment is instructive. In *Gross* v. *Superior Court* (1954) 42 Cal.2d 816 [270 P.2d 1025], a defendant found to be a mentally disordered sex offender and committed to an "institutional unit" on the grounds of a state prison requested free transcripts of the commitment proceedings to aid him in presenting his appeal. Then as now, the sole authorization for such transcripts was Government Code section 69952, providing that "In criminal cases" the fee for a transcript shall be paid out of the county treasury. Because the statute was expressly limited to "criminal cases," the clerk of the superior court refused the request. On the defendant's application for writ of mandate, however, we ordered free transcripts to be prepared. We were not misled by the argument of county counsel that this was a civil proceeding: we recognized it was "not strictly a criminal case," but stressed it had certain of "the features pertinent to such cases." (*Id.* at p. 821.) We then reviewed the various rights of a defendant charged with being a mentally disordered sex offender—listed hereinabove—and concluded *(ibid.),* "Since those things are matters pertaining to the protection and rights of a person similar to one involved in a criminal case we believe he falls within the terms of section 69952 of the Government Code, *supra.*" (See also *In re Brown* (1969) 275 Cal.App.2d 537, 543-544 [79 Cal.Rptr. 897].)

If a defendant charged with being a mentally disordered sex offender is thus entitled to free transcripts on appeal despite the express limitation of the statute to "criminal cases," he must a fortiori be entitled to the far more important right of jury unanimity despite the implied limitation of the Constitution to criminal cases.

In addition to the close procedural similarities between a criminal prosecution and a proceeding to establish that a defendant is a mentally disordered sex offender, the consequences of an adverse determination in each case are no less comparable. In *People* v. *Burnick, supra, ante,* page 306, we hold that a mentally disordered sex offender committed for an indeterminate period to a state mental hospital suffers such a massive curtailment of liberty and such lingering moral stigma that he is entitled to the same standard of proof beyond a reasonable doubt accorded to a criminal defendant. For the same reasons, a mentally disordered sex offender committed to such a hospital is entitled to a unanimous verdict. And just as we have shown in Part I of this opinion that a mentally disordered sex offender committed to an "institutional unit" on the grounds of a state prison is a fortiori entitled to the standard of proof beyond a reasonable doubt, so also a person committed to such a unit is a fortiori entitled to a unanimous verdict. Because commitment to a

prison "institutional unit" results, as we shall explain in Part III of this opinion, in confinement under conditions which are essentially indistinguishable from penal incarceration, Feagley was entitled to the procedural safeguards erected by the California Constitution against the erroneous infliction of such incarceration. Prominent among those safeguards is "the fundamental right to a unanimous jury verdict." (*People* v. *Superior Court* (1967) *supra,* 67 Cal.2d 929, 932.)

A holding to the contrary would in effect instruct the prosecutor that in order to publicly brand a man as a mentally disordered sex offender and confine him for "life imprisonment in a penal institution" (*In re Bevill* (1968) *supra,* 68 Cal.2d 854, 861), he need persuade only 75 percent of the jurors by only 51 percent of the evidence. We cannot believe such a rule would be obedient to either the letter or the spirit of the cited guarantees of the California Constitution.

■ Secondly, the denial of a unanimous verdict pursuant to section 6321 offends the equal protection clauses of the California and federal Constitutions. (Cal. Const., art. I, § 7, subd. (a); U.S. Const., 14th Amend.) In 1967 the Legislature enacted a sweeping revision of the mental health laws of this state (Welf. & Inst. Code, § 5000 et seq., eff. July 1, 1969), known as the Lanterman-Petris-Short Act (hereinafter "LPS Act"). The statute provides that "mentally disordered" persons who are dangerous to themselves or others or are gravely disabled may be detained for 72 hours for evaluation and treatment (§§ 5150-5156) and may then be certified for up to two additional 14-day periods of "intensive treatment" (§§ 5250-5268). Thereafter a petition may be filed in the superior court for an order committing the person for "postcertification treatment" on the ground he or she is an "imminently dangerous person." (§§ 5300-5301.) The person is entitled to court-appointed counsel and a jury trial of the issue. (§ 5302.) And by a 1968 amendment to the original statute the Legislature specifically decreed that "The decision of the jury must be unanimous . . . ." (§ 5303.)

The issue, therefore, is whether the state may constitutionally deny to persons committed under the mentally disordered sex offender law the right to a unanimous jury which it grants to persons committed under the LPS Act. As in *People* v. *Burnick, supra, ante,* page 306, we find guidance in decisions of the United States Supreme Court interpreting the equal protection clause of the Fourteenth Amendment to the federal Constitution.

*Baxstrom* v. *Herold* (1966) *supra,* 383 U.S. 107, reviewed a New York statutory procedure for involuntary civil commitment of convicts whose prison term was about to expire and who were determined by the court to require care and treatment in an institution for the mentally ill. The statute did not provide for a jury trial of the issue, although all other classes of persons civilly committed in New York were granted that right. The United States Supreme Court held the denial of a jury trial to be unconstitutional, reasoning (at p. 111 [15 L.Ed.2d at p. 623]) that "the State, having made this substantial review proceeding generally available on this issue, may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some."

*Humphrey* v. *Cady* (1972) 405 U.S. 504 [31 L.Ed.2d 394, 92 S.Ct. 1048], considered the Wisconsin Sex Crimes Act, which provided that upon conviction of any crime determined to be sexually motivated and a further finding by the court that the defendant needed treatment for his "mental and physical aberrations," the latter could be civilly committed for a period equal to the maximum authorized for his crime. At the end of that time a series of five-year extensions of the commitment could be ordered upon a finding by the court that the defendant's release would be dangerous to the public because of his mental or physical disorder. No jury trial was provided at either stage, whereas a person involuntarily committed under Wisconsin's general Mental Health Act was granted that right.

A defendant undergoing such a five-year extension of his commitment sought federal habeas corpus, and the United States Supreme Court held that his claim of denial of equal protection was so substantial in light of *Baxstrom* as to require a full evidentiary hearing. In particular the court noted (at p. 512 [31 L.Ed.2d at p. 404]) that "the Mental Health Act and the Sex Crimes Act are not mutually exclusive; that 'aberrations' warranting commitment under the latter might also amount to 'mental illness' warranting commitment under the former. The equal protection claim would seem to be especially persuasive if it develops on remand that petitioner was deprived of a jury determination, *or of other procedural protections,* merely by the arbitrary decision of the State to seek his commitment under one statute rather than the other." (Fns. omitted; italics added.) We have likewise recognized in California that although it might not be true of all persons, "Many individuals who satisfy the definition of 'mentally disordered sex offender' would be subject to civil commitment to a mental institution under other provisions of the law," citing, inter alia, the LPS Act. (*In re Bevill* (1968) supra, 68 Cal.2d 854, 860.)

We are aware, of course, that *Baxstrom* and *Humphrey* dealt with the denial of the right to *any* jury rather than a unanimous jury. Yet they declared general principles which we find persuasive in the case at bar. Similarly, in *Jackson* v. *Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845], the United States Supreme Court was faced with a claim that the equal protection clause was violated by the fact that Indiana statutory procedure for pretrial commitment of incompetent criminal defendants provided a standard for release which was more stringent than that required for persons committed under the state's general mental health laws. The court reasoned, "*Baxstrom* did not deal with the standard for release, but its rationale is applicable here." (*Id.* at p. 729 [32 L.Ed.2d at p. 446].) Neither did *Baxstrom* deal with the jury unanimity requirement, "but its rationale is applicable here."

In *Baxstrom* the Supreme Court rejected the state's attempted justification of the jury trial discrimination on the ground of the asserted dangerousness of mentally ill persons who have been convicted of a crime, explaining that "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. [Citation.] Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all*. For purposes of granting judicial review before a jury of the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments." (Italics in original.) (383 U. S. at pp. 111-112 [15 L.Ed.2d at p. 624].)

Here, too, dividing "mentally disordered" persons into two classes according to whether they are or are not assertedly predisposed to commit sex offenses may be a reasonable distinction for determining questions of custody and treatment—a question on which we express no view—but it is irrelevant to the question whether they are mentally disordered in the first place. The substantial distinction between the burden of convincing all the jurors and the burden of convincing only nine of them that a defendant is a mentally disordered sex offender is thus wholly unrelated to "the purpose for which the classification is made," and hence constitutes a denial of equal protection.

The People take the position that the issue was settled to the contrary by *In re Gary W.* (1971) *supra,* 5 Cal.3d 296. That is a considerable overstatement of *Gary W.* One of the two dispositive questions in the case was whether the equal protection clause was violated by the denial of a jury trial after a court order extending the control of the California Youth Authority over one of its wards beyond his normal release date. (Welf. & Inst. Code, §§ 1800-1803.) Relying at some length on *Baxstrom,* we held that the denial of a jury trial to such a person deprived him of equal protection in view of the fact that the same right was accorded in other classes of civil commitments. (*Id.* at pp. 303-308.) That is all we actually decided on the point.

Having declared a new right to jury trial, however, we felt impelled to add a brief directive concerning its implementation. Finding at hand a convenient analogy to the commitment of mentally disordered sex offenders and civil narcotics addicts, we suggested that the three-fourths verdict procedure prescribed by statute in those programs also be followed in jury trials thereafter held under section 1800. (*Id.* at p. 308.) But we did not *decide* the question whether that procedure violates the equal protection clauses of the California and federal Constitutions on the ground that unanimous verdicts are required in trials under the LPS Act. Indeed, the question was not even presented to us: it was not raised at the trial level, and was neither briefed nor argued on appeal. It is not our practice to decide constitutional issues by indirection and inference.

Far more important for present purposes is the reasoning of *Gary W.* Citing leading cases on the law of equal protection, we said (at p. 306 of 5 Cal.3d): "The necessity for a rational distinction among persons whom the law treats differently is of particular importance in the area of involuntary commitment. Although normally any rational connection between distinctions drawn by a statute and the legitimate purpose thereof will suffice to uphold the statute's constitutionality [citation], closer scrutiny is afforded a statute which affects fundamental interests or employs a suspect classification. [Citations.][11] In such cases the state bears the burden of establishing both that the state has a compelling interest which justifies the law and that the distinction is necessary to further that purpose. [Citations.]

---

[11]Recent law review writers are divided on whether mental illness is itself a "suspect classification" requiring strict scrutiny when it is the justification for involuntary commitment. (Compare Note, *Mental Illness: A Suspect Classification?* (1974) 83 Yale L.J. 1237, 1258-1267, with *Developments in the Law—Civil Commitment of the Mentally Ill* (1974) 87 Harv.L.Rev. 1190, 1229-1230, fn. 153.)

"A variety of interests have been held to be so 'fundamental' as to impose this burden on the state. Voting [citation], procreation [citation], interstate travel [citation], and education[12] have all been characterized as fundamental for this purpose. The right to a jury trial in an action which may lead to the involuntary confinement of the defendant, even if such confinement is for the purpose of treatment, is no less fundamental."

As noted above, we have likewise characterized the right to a unanimous verdict under the California Constitution as "fundamental." (*People* v. *Superior Court* (1967) *supra,* 67 Cal.2d 929, 932.) It follows that under the rule of *Gary W.* (see also *People* v. *Smith* (1971) 5 Cal.3d 313, 318-319 [96 Cal.Rptr. 13, 486 P.2d 1213]) the state must bear the burden of demonstrating there is a compelling interest which justifies this significant distinction between the rights of mentally disordered sex offenders and those of persons committed under the LPS Act, and that the distinction is necessary to further such purpose.

The People make no effort to comply with this rule. At most they attempt to show a "rational basis" for the distinction, and even that venture fails. The People emphasize that the commitment of a mentally disordered sex offender is "first triggered by a criminal conviction," while a commitment under the LPS Act is not. But as we observed in *People* v. *Burnick, supra, ante,* pages 329-330, the criminal offense of which the defendant was convicted need have no relevance at all to the issues subsequently adjudicated in the mentally disordered sex offender proceedings. Moreover, it is clear from *Baxstrom* and *Humphrey* that an individual's status as a prior criminal offender cannot of itself justify a classification denying him the fundamental right of trial by jury in subsequent civil commitment proceedings. For similar reasons it cannot support a denial of his right, no less fundamental under the California Constitution, to a unanimous verdict.

Nor is it relevant that Feagley had already been adjudged a mentally disordered sex offender at the initial commitment hearing. (Cf. *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465].) At that stage of the proceedings Feagley had no statutory right to a jury trial of any kind. (See §§ 6302-6316.) The trial here in issue was therefore his first and only opportunity to present to a jury the evidence supporting his assertion that he was not a mentally disordered sex offender. At that trial the contrary finding of the judge at the commitment hearing was not

[12]Citing *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180]; but now see *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 29-39 [36 L.Ed.2d 16, 40-47, 93 S.Ct. 1278].

disclosed to the jurors, and it properly had no part in their deliberations. New evidence was introduced, however, and medical witnesses testified who had not participated in the commitment hearing. The proceeding, in sum, was a full-scale trial de novo of the question whether Feagley was a mentally disordered sex offender. It was therefore indistinguishable in its effect and importance from the trial provided by section 5303, in which an individual proceeded against under the LPS Act also seeks for the first time to persuade a jury that he is not a mentally disordered person. Accordingly, there is no rational basis for granting the latter the right to a unanimous verdict while denying it to the former.[13]

Finally, insofar as commitment procedures under the LPS Act and the mentally disordered sex offender law differ, it would appear that the latter should be encompassed by greater, not lesser, procedural safeguards than the former. The statutes may be contrasted in two principal respects.

First, the standards for commitment are such that it is significantly easier for the state to obtain custody of a person under the mentally disordered sex offender law than under the LPS Act. In the first case the trier of fact need be persuaded only that by reason of mental disorder the person is "predisposed" to commit "sexual offenses" to the extent that he is "dangerous" to others. (§ 6300.) To commit a person for postcertification treatment under the LPS Act, however, it must be established that he "attempted or inflicted physical harm upon the person of another," and by reason of mental disorder presents "an imminent threat of substantial physical harm" to others. (§ 5304.) Commitment for a mere "predisposition" to cause harm is obviously a more lenient standard than an actual "attempt" or "infliction" of that harm; and a general showing of "dangerousness" is simpler to make than proof of an "imminent" threat of "substantial" physical injury.

Secondly, the standards for release are such that it is much more difficult for a mentally disordered sex offender to obtain his freedom

---

[13]The People also point to the fact that pursuant to Welfare and Institutions Code section 3108 a person may be civilly committed as a narcotics addict by a three-fourths verdict of the jury. If this is meant to be an argument in support of denying a unanimous verdict in trials of alleged mentally disordered sex offenders, it was refuted in *Gary W.* There the Attorney General attempted to sustain the denial of a jury trial to Youth Authority wards under section 1800 by arguing that the classification was reasonable because the statutes providing for commitment of mentally retarded persons likewise failed to grant the right of jury trial. We quickly rejected the argument, reasoning, "The state does not meet its burden of demonstrating a compelling interest in denying the right to jury trial to Youth Authority wards . . . by pointing out that alleged mentally retarded persons are similarly discriminated against." (5 Cal.3d at p. 308.)

than it is for a person committed under the LPS Act. A mentally disordered sex offender is confined for an indefinite period either in a maximum security state mental hospital or in an institutional unit on the grounds of a state prison, and he may not be released until he has been certified by the institutional authorities or found by the court to be "unable to benefit" from further care and treatment and "no longer a danger to the health and safety of others." (§§ 6316, 6325-6327.) A person committed for postcertification treatment under the LPS Act, however, may be placed in an intensive treatment facility located in his county of residence, and must *automatically* be released at the expiration of 90 days. (§ 5304.)[14] Indefinite commitment until the person can no longer "benefit" from treatment and is deemed no longer "a danger to the health and safety of others" is, of course, an immeasurably more stringent standard of release than automatic discharge after a fixed maximum of 90 or 180 days.

It follows that in comparison with the procedure under the LPS Act, it is easier to commit a man as a mentally disordered sex offender and harder for him to secure his release. One would therefore expect the procedural safeguards in the latter proceeding to be commensurately greater. Instead, they are substantially lesser, in that the Legislature denies the mentally disordered sex offender the right to a unanimous jury verdict which it grants to a person committed under the LPS Act. This is common sense turned upside down, a discrimination without semblance of rational basis—let alone a compelling state interest, and a wholesale denial of equal protection of the laws under both the California and federal Constitutions.[15]

### III

Turning from deficiencies in the procedure of adjudication to the substance of the ensuing commitment, we confront grave questions

---

[14]A second 90-day period of treatment—but no more—may be ordered by the court; and even that step requires a new petition and a new showing of imminent danger equivalent to that submitted in support of the original petition. *(Id.)*

[15]Indeed, to the extent the same persons may be committed under either program, as we recognized in *In re Bevill* (1968) *supra,* 68 Cal.2d 854, 860, the discrimination here identified falls squarely within the proscription of *Jackson* v. *Indiana* (1972) *supra,* 406 U.S. 715, 730 [32 L.Ed.2d 435, 446]: "we hold that by subjecting Jackson to a more lenient commitment standard and to a more. stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by [statutes providing for commitment of feeble-minded or mentally ill persons in general], Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment." (Fn. omitted.)

concerning the conditions under which the state may constitutionally confine persons whom it has civilly committed.

"The sexual psychopath law was passed by the Legislature because experience had shown that persons who came within the classification of sexual psychopaths were unable to benefit from ordinary penal confinement and were in need of medical treatment." (*People* v. *McCracken* (1952) 39 Cal.2d 336, 345 [246 P.2d 913].) Not only is medical treatment the *raison d'etre* of the mentally disordered sex offender law, it is its sole constitutional justification. ■ It is settled that "A person committed as a mentally disordered sex offender is not confined for the criminal offense but because of his *status* as a mentally disordered sex offender." (Italics added.) (*In re Bevill* (1968) *supra,* 68 Cal.2d 854, 858.) It is this very fact which has been held to save the mentally disordered sex offender law from violation of the double jeopardy clause. (*In re Keddy* (1951) *supra,* 105 Cal.App.2d 215, 217.)

■ But involuntary confinement for the "status" of having a mental or physical illness or disorder constitutes a violation of the cruel and unusual punishment clauses of both the state and federal Constitutions (Cal. Const., art. I, § 17; U.S. Const., 8th & 14th Amends.) unless it is accompanied by adequate treatment. (*Robinson* v. *California* (1962) 370 U.S. 660, 665-667 [8 L.Ed.2d 758, 762-763, 82 S.Ct. 1417]; *In re Gary W.* (1971) *supra,* 5 Cal.3d 296, 301; *In re De La O* (1963) 59 Cal.2d 128, 136 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705]; *Martarella* v. *Kelley* (S.D.N.Y. 1972) 349 F.Supp. 575, 585, 598-600; *People* ex rel. *Kaganovitch* v. *Wilkins* (1965) 23 App.Div.2d 178 [259 N.Y.S.2d 462, 465-466].) "When patients are so committed for treatment purposes they unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition. [Citations.] Adequate and effective treatment is constitutionally required because, absent treatment, the hospital is transformed 'into a penitentiary where one could be held indefinitely for no convicted offense.' [Citation.] The purpose of involuntary hospitalization for treatment purposes is *treatment* and not mere custodial care or punishment. This is the only justification, from a constitutional standpoint, that allows civil commitments to mental institutions . . . ." (*Wyatt* v. *Stickney* (M.D.Ala. 1971) 325 F.Supp. 781, 784, affd. sub nom. *Wyatt* v. *Aderholt* (5th Cir. 1974) 503 F.2d 1305.)[16]

---

[16]Other recent decisions hold that the denial of adequate treatment to persons involuntarily confined upon a civil commitment violates the due process clause. (*Donaldson* v. *O'Connor* (5th Cir. 1974) 493 F.2d 507, 520, cert. granted (1974) 419 U.S.

Relying on the foregoing authorities, Feagley contends he was illegally committed to an institution in which adequate treatment was not furnished. The Attorney General replies that Feagley has mistaken his remedy, emphasizing that portion of the above-quoted definition of "institutional unit" (§ 6326, par. 3) which characterizes its purpose as "the custodial care *and treatment*" of mentally disordered sex offenders. This language, argues the Attorney General, gives Feagley a *statutory* right to treatment; and if he is confined without treatment, he may enforce that right by seeking his release through a petition for writ of habeas corpus. As authority for this proposition the Attorney General relies on *In re Gary W.* (1971) *supra*, 5 Cal.3d 296, 302-303.

*Gary W.* is indeed controlling, but not in the sense claimed by the Attorney General. ■ It is true we there recognized the appropriateness of habeas corpus to test a civil confinement which is in violation of a statutory right to treatment, and we reaffirm that remedy. But *Gary W.* was not limited to that point. As noted above, the case dealt with the power of the California Youth Authority, under sections 1800 to 1803, to retain custody of a ward beyond his normal release date if he is found to be dangerous by reason of mental or physical disorder; if deemed

894 [42 L.Ed.2d 138, 95 S.Ct. 171]; *Welsch v. Likins* (D.Minn. 1974) 373 F.Supp. 487, 499; *Stachulak v. Coughlin* (N.D.Ill. 1973) 364 F.Supp. 686, 687; *Davy v. Sullivan* (M.D.Ala. 1973) 354 F.Supp. 1320, 1329; *Martarella v. Kelley* (S.D.N.Y. 1972) *supra*, 349 F.Supp. 575, 585; *Wyatt v. Stickney* (M.D.Ala. 1971) *supra*, 325 F.Supp. 781, 785; *Nason v. Superintendent of Bridgewater State Hosp.* (1968) 353 Mass. 604 [233 N.E.2d 908, 913-914] (also a denial of equal protection of the law); see generally *Rouse v. Cameron* (1966) 373 F.2d 451, 453 [125 App.D.C. 366]; *Millard v. Cameron* (1966) 373 F.2d 468, 472-473 [125 App.D.C. 383].)

The topic has been much discussed in the legal periodicals. (See, e.g., Symposium, *Right to Treatment* (1969) 57 Geo.L.J. 673; Symposium, *Right to Treatment* (1969) 36 U.Chi.L.Rev. 742-801; Schwitzgebel, *The Right to Effective Mental Treatment* (1974) 62 Cal.L.Rev. 936; Schwitzgebel, *Right to Treatment for the Mentally Disabled: The Need for Realistic Standards and Objective Criteria* (1973) 8 Harv. Civ. Rights—Civ Lib. L. Rev. 513; Reisner, *Psychiatric Hospitalization and the Constitution: Some Observation on Emerging Trends,* 1973, Ill. L.F. 9, 13-17; Drake, *Enforcing the Right to Treatment: Wyatt v. Stickney* (1972) 10 Am.Crim.L.Rev. 587; Birnbaum, *Some Remarks on "The Right to Treatment"* (1971) 23 Ala.L.Rev. 623; George, *Due Process in Protective Activities* (1968) 8 Santa Clara Law. 133, 140-143; Birnbaum, *The Right to Treatment* (1960) 46 A.B.A.J. 499; Comment, *Wyatt v. Stickney and the Right of Civilly Committed Mental Patients to Adequate Treatment* (1973) 86 Harv.L.Rev. 1282; Note, *A New Emancipation: Toward an End to Involuntary Civil Commitments* (1973) 48 Notre Dame Law. 1334, 1343-1351; Note, *Guaranteeing Treatment for the Committed Mental Patient: The Troubled Enforcement of an Elusive Right* (1972) 32 Md.L.Rev. 42; Note, *Involuntary Civil Commitment —A Constitutional Right to Treatment* (1972) 23 Syracuse L.Rev. 125; Note, *Due Process for All—Constitutional Standards for Involuntary Commitment and Release* (1967) 34 U.Chi.L.Rev. 633, 636-654; Note, *The Nascent Right to Treatment* (1967) 53 Va.L.Rev. 1134; Note, *Civil Restraint, Mental Illness, and the Right to Treatment* (1967) 77 Yale L.J. 87.)

unsuitable for treatment in a Youth Authority facility, such a person may be confined in a facility of the Department of Corrections. The ward in question challenged his continued custody on the ground, inter alia, that it constituted cruel and unusual punishment. We reasoned that the statutory scheme did not "imprison" the ward "as a criminal" because the Legislature had taken pains to assure that confinement thereunder "shall be *only* for the purpose of treatment. Thus, we need not decide whether confinement under these sections, with the potential for confinement in a state prison, would be constitutionally permissible *solely* for the purpose of protecting society." (Italics added.) (5 Cal.3d at p. 301.)

By contrast, the California cases have made it plain that the mentally disordered sex offender law is designed to serve both such legislative aims, and although confinement thereunder is not "solely" for the protection of society, that is nevertheless its "primary purpose" (*In re Bevill* (1968) *supra,* 68 Cal.2d 854, 858); rehabilitative treatment of the mentally disordered sex offender is, at best, its "secondary purpose" (*People* v. *Levy* (1957) 151 Cal.App.2d 460, 468 [311 P.2d 897]). To say that confinement is for the "protection of society," of course, does not insulate it from constitutional inquiry: "One of the reasons society *imprisons* those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment." (Italics added.) (*United States* v. *Brown* (1965) 381 U.S. 437, 458 [14 L.Ed.2d 484, 497, 85 S.Ct. 1707].) The constitutional issue recognized in *Gary W.* must therefore be confronted.

We find guidance in the succeeding portions of the *Gary W.* opinion. After pointing out the statutory duty of the Youth Authority to provide treatment for the underlying cause of the ward's dangerousness, we explained (5 Cal.3d at p. 302): "If the cause is not a physical or mental condition *or the condition is not amenable to treatment,* the Youth Authority may not extend its control over the ward pursuant to sections 1800-1803." (Italics added; fn. omitted.) Feagley's condition, it will be remembered, was specifically found to be "not amenable to treatment" in a state hospital; yet in the very same order he was committed to an institution for custodial care "and treatment."[17] It is evident that if the

---

[17]The order was entered pursuant to section 6316, which provides in relevant part that "If, however, such court [i.e., the court in which the criminal charge was tried] is satisfied that the person is a mentally disordered sex offender but would not benefit by care or *treatment* in a state hospital it may re-certify the person to the superior court of the county. The superior court may make an order committing the person for an indefinite period to the Department of Mental Hygiene for placement in a state institution or

statutory scheme which authorizes this apparent contradiction is to have a rational explanation, "treatment" in a prison institutional unit must mean something other than "treatment" in a state hospital. It thus becomes necessary to determine what is the treatment, if any, actually furnished to mentally disordered sex offenders confined in a prison unit.

The appropriateness of this inquiry is further indicated by *Gary W.* We there concluded (at p. 302) that the statutory scheme for potential long-term confinement of dangerous Youth Authority wards in facilities of the Department of Corrections did not constitute cruel and unusual punishment under *Robinson* v. *California* (1962) *supra,* 370 U.S. 660, "in the absence of any evidence that persons committed thereunder are incarcerated in penal institutions among the general prison population, or are customarily detained without treatment . . . ."[18] The clear two-fold implication of this language is (1) that the effect of a statutory declaration of the right to treatment may be negated by evidence that such treatment is not in fact provided and (2) that in such case the confinement will run afoul of the cruel and unusual punishment clause. In short, "the mere characterization of an act as 'treatment' does not insulate it from eighth amendment scrutiny." (*Knecht* v. *Gillman* (8th Cir. 1973) 488 F.2d 1136, 1139, citing *Trop* v. *Dulles* (1958) 356 U.S. 86, 95 [2 L.Ed.2d 630, 639, 78 S.Ct. 590]; *Vann* v. *Scott* (7th Cir. 1972) 467 F.2d 1235, 1240; *Inmates of Boys' Training School* v. *Affleck* (D.R.I. 1972) 346 F.Supp. 1354, 1366.) Rather, "to be sustained as a nonpenal statute, in its application to the defendant, it is necessary that the remedial aspect of confinement thereunder have foundation in fact. It is not sufficient that the Legislature announce a remedial purpose if the consequences to the individual are penal." (*Commonwealth* v. *Page* (1959) 339 Mass. 313 [159 N.E.2d 82, 85].)

This inquiry is but a specific application of the broader principle that constitutional issues are to be resolved by considerations of substance rather than form. In the first case to reach the United States Supreme Court challenging a sexual psychopath statute the high court admonished that such a law "though 'fair on its face and impartial in appearance' may be open to serious abuses in administration" (*Minneso-*

---

institutional unit for the care and *treatment* of mentally disordered sex offenders designated by the court and provided pursuant to Section 6326." (Italics added.)

[18]Similarly, in the only prior California decision to consider the issue in any depth (*People* v. *Rancier* (1966) 240 Cal.App.2d 579, 582 [49 Cal.Rptr. 876]), the court ruled that the mentally disordered sex offender law does not inflict cruel and unusual punishment because "We cannot say on the record before us that appellant has been or in the future will be denied treatment."

*ta* v. *Probate Court* (1940) 309 U.S. 270, 277 [84 L.Ed. 744, 751, 60 S.Ct. 523, 126 A.L.R. 530]). In *Pearson,* we note, the mentally disordered sex offender faced commitment to an asylum (*id.* at p. 276 [84 L.Ed. at p. 750]), not to a state prison. Similarly, in *People* v. *Valdez* (1968) 260 Cal.App.2d 895, 904 [67 Cal.Rptr. 583], the Court of Appeal rejected a constitutional challenge to the statutory scheme for civil commitment of narcotics addicts (Welf. & Inst. Code, § 3000 et seq.) by observing that the proceeding had repeatedly been described as "civil," "non-punitive," and "remedial." In so doing, however, the court warned that "A situation may well arise where such characterization may break down in the face of the reality of the addict's involuntary confinement." Here, while not questioning the overall civil nature of mentally disordered sex offender proceedings (*People* v. *McCracken* (1952) *supra,* 39 Cal.2d 336, 346), it is time to face the "reality" of the treatment provided to those who are committed to a prison unit pursuant to sections 6316 or 6326.[19]

We begin with the first question suggested by *Gary W.,* i.e., whether mentally disordered sex offenders committed to institutional units are "incarcerated in penal institutions among the general prison population." In response to our request for supplemental briefing of the issue whether such confinement is penal in nature, Feagley advised the court that he was housed in a cell in "D Quad" of the California Men's Colony, East Facility; that he mingled freely with the general prison population, wore standard prison clothing, worked for wages of a few cents an hour in the prison shop, submitted to full censorship of his mail, and was subject to all prison regulations concerning security. In his reply brief, however, the Attorney General declines to join the issue, neither conceding nor disputing the truth of these assertions; rather, he adopts the position that they involve matters outside the record and hence cannot be considered by us in this proceeding.

Nevertheless, we are certainly not foreclosed from considering the language and effect of a number of *statutory* provisions bearing directly

---

[19]Chief Judge David L. Bazelon of the District of Columbia Circuit Court of Appeals, a principal architect of the right to treatment, has admonished that the uncertainty in the typical statutory definition and finding of dangerousness sufficient to warrant involuntary civil commitment "is tolerated on the rationalization that the person is not being imprisoned, but rather hospitalized for treatment. Of course, when no treatment is forthcoming, we cluck sympathetically but reluctantly refuse to release the individual because he is dangerous. [¶] This chicanery is intolerable. Courts cannot force legislatures to provide adequate resources for treatment. But neither should they play handmaiden to the social hypocrisy which rationalizes confinement by a false promise of treatment. Quite the contrary, courts should and must reveal to society the reality that often festers behind the euphemism of 'hospitalization.'" (Bazelon, *Implementing the Right to Treatment* (1969) 36 U.Chi.L.Rev. 742, 749.)

on this question. We are not unmindful of two general declarations of legislative intent that mentally disordered individuals should be regarded as "patients" and "sick persons." (§§ 4132, 6250.) These are admirable sentiments. Unfortunately the Legislature seems to have overlooked them in prescribing the conditions of confinement of mentally disordered sex offenders unamenable to treatment in a state hospital. After defining the "institutional units" in which such persons must be placed, section 6326 provides that "Each such unit shall be administered in the manner provided by law for the government of the institution in which such unit is established." In other words, a unit for the confinement of mentally disordered sex offenders on the grounds of a state prison *must be administered in the same manner as the rest of the prison.* In fact, in the case of the California Men's Colony, which as noted above houses most of the mentally disordered sex offenders not amenable to hospital treatment, the *entire institution* has been designated as such a "unit" within the meaning of sections 6316 and 6326. (Inmate Classification Manual (Dept. Corrections) p. CL-IX-05, par. 5.) Mentally disordered sex offenders received at the California Men's Colony "will be housed initially in D-Quad at the East facility, but some may qualify later for West facility [i.e., where a lower degree of security is maintained] after psychiatric clearance." (*Ibid.*) Feagley was eventually transferred to the West Facility; at that location, however, "no therapy is available" (*id.* at p. CL-IX-03). D Quad, it should be added, is by no means devoted exclusively to housing mentally disordered sex offenders: as of December 31, 1972, for example, only 52 of the 600 men in D Quad were in that category. (Note, *Toward a Less Benevolent Despotism: The Case for Abolition of California's MDSO Laws* (1973) 13 Santa Clara Law. 579, 602 [hereinafter cited as Santa Clara Note].)

In addition, the rules and regulations governing the California Men's Colony are made by the Director of Corrections. (Pen. Code, §§ 2046.3, 5058.) The general statutory provisions concerning the management of state prisons (Pen. Code, pt. 3) apply to the institution and its inmates. (Pen. Code, § 2046.6.) Among those provisions are laws requiring the Department of Corrections to furnish each inmate "with a bed of straw or other suitable material, and sufficient covering of blankets, and with garments of coarse, substantial material and of distinctive manufacture" (Pen. Code, § 2084), to sequester any personal property of value (Pen. Code, § 2085), to censor the inmate's correspondence except with attorneys or public officials (Pen. Code, § 2600), and to suspend most of his civil rights (*id.*).

The penal nature of these conditions of confinement is dramatically underscored by comparing the provisions of the Welfare and Institutions Code which guarantee a *nonpenal* form of custody to mentally disordered sex offenders found amenable to treatment and committed to a state hospital. Section 6328 authorizes the superintendent of the hospital to extend to such a person all privileges granted to other patients which are not incompatible with his detention or unreasonably conducive to escape. A more recent statute goes considerably further: "Any person admitted to a state hospital as a mentally disordered sex offender shall have the *full patient rights* specified in Article 7 (commencing with Section 5325) of Chapter 2 of Part 1 of Division 5." (Italics added.) (§ 6300.2, enacted in 1972.) Two sections of the cited article are of particular relevance. Section 5325 guarantees the patient the right, inter alia, to wear his own clothes, to retain his personal possessions, to have visitors on a daily basis, to make and receive confidential telephone calls, and to send and receive uncensored mail.[20] Supplementing this provision, section 5327 declares that a state hospital patient is entitled not only to exercise the listed rights but also to "retain all rights [i.e., civil rights] not specifically denied him under this part."

The contrast with the penal circumstances surrounding a mentally disordered sex offender committed to an "institutional unit" of a state prison, listed above, is stark indeed. Accordingly, the statutes fully support counsel's appraisal of the realities of the situation—that under the conditions of confinement which prevail by law at the California Men's Colony, Feagley was in fact "part and parcel of the mainstream of prison life."[21]

---

[20]Section 5325 specifies these rights as follows:

"(a) To wear his own clothes; to keep and use his own personal possessions including his toilet articles; and to keep and be allowed to spend a reasonable sum of his own money for canteen expenses and small purchases.

"(b) To have access to individual storage space for his private use.

"(c) To see visitors each day.

"(d) To have reasonable access to telephones, both to make and receive confidential calls.

"(e) To have ready access to letter writing materials, including stamps, and to mail and receive unopened correspondence.

"(f) To refuse shock treatment.

"(g) To refuse lobotomy.

"(h) Other rights, as specified by regulation."

[21]Commendably the People do not rely on *In re Cruz* (1965) 62 Cal.2d 307, 313-317 [42 Cal.Rptr. 220, 398 P.2d 412], for a contrary conclusion. The petitioner in that case was a *civilly committed narcotics addict* who was reported to be "unwilling or unable to fully participate" in the institutional program at the California Rehabilitation Center, and for that reason was administratively confined in the "branch" of the California Rehabilitation Center located on the grounds of the California Men's Colony. This court denied his

We take up now the second issue raised in *Gary W.,* i.e., whether mentally disordered sex offenders committed to institutional units are "customarily detained without treatment." (5 Cal.3d at p. 302.) In reviewing the evidence on this point we shall proceed from the general to the specific.

On the national level a number of commentators have called attention to the lack of any effective institutional treatment for mentally disordered sex offenders.[22] The views of only two need be quoted, as they are typical of this consensus. Professor Paul W. Tappan, whose in-depth research on habitual sex offenders led to the enactment of landmark New Jersey legislation on the subject, has summarized his experience as follows: "As compared with other types of psychological and constitutional abnormality, we are peculiarly at a loss in the handling of abnormal sex offenders. Methods of effective treatment have not yet been worked out. The states that have passed special laws on the sex deviate do not even attempt treatment. The 'patients' are kept in bare custodial confinement. This point is central to the atrocious policy of those jurisdictions that commit noncriminals and minor deviates for indefinite periods to mental hospitals where no therapy is offered. Most psychiatrists indicate that psychotherapy of some sort should be given to sex offenders, but they are in agreement that professional staffing is not

---

application for habeas corpus, rejecting, inter alia, his contention that the conditions of his confinement in the California Men's Colony were indistinguishable from penal incarceration and hence constituted cruel and unusual punishment in violation of the Eighth Amendment and *Robinson* v. *California* (1962) *supra,* 370 U.S. 660. As with the question of the standard of proof in narcotics addict commitment proceedings (see *People* v. *Burnick, supra, ante,* pp. 331-332, fn. 21), we are not called upon to determine whether the *Cruz* holding remains viable today. Nevertheless, any proposal to rely thereon would do well to take into account the jurisprudential developments of the intervening decade, including *Gary W.* and our decision herein.

[22]See, e.g., The Mentally Disabled and the Law (Brakel & Rock ed. 1971), pp. 352-353; Morris, *Psychiatry and the Dangerous Criminal* (1968) 41 So.Cal.L.Rev. 514, 538-539; Swanson, *Sexual Psychopath Statutes: Summary and Analysis* (1960) 51 J. Crim. L. C. & P. S. 215, 224-225; Fahr, *Iowa's New Sexual Psychopath Law—An Experiment Noble in Purpose?* (1956) 41 Iowa L.Rev. 523, 531-546; Hacker & Frym, *The Sexual Psychopath Act in Practice: A Critical Discussion* (1955) 43 Cal.L.Rev. 766, 773-775; Tappan, *Some Myths About the Sex Offender* (June 1955) 19 Fed.Prob. 7, 11; Comment, *California's Sexual Psychopath—Criminal or Patient?* (1967) 1 U.S.F. L.Rev. 332, 337; Comment, *The Validity of the Segregation of the Sexual Psychopath Under the Law* (1965) 26 Ohio St. L.J. 640, 655-657; Comment, *Sexual Psychopathy—A Legal Labyrinth of Medicine, Morals and Mythology* (1957) 36 Neb.L.Rev. 320, 339-344; Note, *The Plight of the Sexual Psychopath: A Legislative Blunder and Judicial Acquiescence* (1966) 41 Notre Dame Law. 527, 550-555; Santa Clara Note, pages 600-603; see generally Schwitzgebel, *The Right to Effective Mental Treatment* (1974) 62 Cal.L.Rev. 936, 941-948; Burt, *Of Mad Dogs and Scientists: The Perils of the "Criminal-Insane"* (1975) 123 U.Pa.L.Rev. 258, 285-288.

available to perform this work and that an unknown but undoubtedly very high percentage of deviates would not respond to such treatment." (Tappan, *Some Myths About the Sex Offender* (June 1955) 19 Fed.Prob. 7, 11.)

A recent large-scale study of the problem sponsored by the American Bar Foundation is no less pessimistic: "Sex psychopathy legislation appears to be an example of an area where the law has assumed a state of medical (and perhaps social) advancement that has not yet been attained, particularly in relation to the question of treatment of the sexual psychopath. At present there is insufficient scientific knowledge to assure meaningful diagnosis and effective treatment—a medical problem greatly aggravated by the sociological one that personnel resources and physical facilities for sexual psychopathic patients are lacking. . . . In part such failure may be attributed to the lack of an adequate number of *trained* personnel in these facilities. But the problem appears to go deeper than that: even assuming total adequacy of staff and space resources, serious questions remain about the ability of medical science to cure or substantially improve the vast majority of sexual psychopaths." (The Mentally Disabled and the Law (Brakel & Rock ed. 1971) p. 352.) In language particularly relevant to the constitutional issue now engaging our attention, the American Bar Foundation study concluded (*id.* at p. 353) that "certainly in this country, treatment of the sexual psychopath represents an ideal which is not attained in practice. Instances of successful rehabilitation are few and are purchased at the high cost of subjecting certain groups of individuals labeled as sexual psychopaths to prolonged detention without meaningful treatment and hence limited, perhaps questionable, impact on the general public safety. [¶] The lack of treatment constitutes a basic condemnation of the sexual psychopathy laws, since the very philosophy behind, and justification for, such legislation is that sex offenders should be treated rather than punished. Lack of treatment destroys any otherwise valid reason for differential consideration of the sexual psychopath." (Fns. omitted.)[23]

A California legislative body has made similar findings. The Subcommittee on Sex Crimes of the Assembly Interim Committee on Judicial System and Judicial Process conducted a thorough investigation of the

---

[23]The study added, "The courts in some jurisdictions have already indicated that the mentally disabled patient has a 'right to treatment.' It would be anomalous not to extend this right to the sexually deviant patient. In fact, the logic of several recent judicial decisions concerning the disposition of sex psychopath cases already suggests that a 'right of treatment' applies to such offenders." (Fns. omitted.)

types and quality of treatment being furnished to mentally disordered sex offenders in California and elsewhere. (Prelim. Rep. (1950) pp. 49-55.) It reported that "The demand for treatment of these violators has been relatively sterile because there is no unanimity of thought within the professional groups normally engaged in the treatment of personal and social ills. Within the framework of existing knowledge there are many recommendations but few conclusive or verified assertions." (*Id.* at p. 49.) Of the various methods of treatment considered, individual psychotherapy was considered the most promising but because of its cost it was found to be "prohibitive on a large scale." (*Id.* at p. 50.) Surgical techniques (e.g., sterilization, lobotomy, or castration), chemotherapy (hormones and drugs), and electroshock procedures were found to have produced inconclusive or negative results. (*Id.* at pp. 50-53.)[24] Group therapy remained as a possible treatment method, but it was emphasized (*id.* at p. 76) that "there are not sufficient facilities nor trained personnel to handle the 'treatment' of all sex offenders, or perhaps even of all 'dangerous sex offenders.' The subcommittee concludes, however, that much research is needed as to what constitutes treatment before large facilities or excess personnel could be used profitably. Psychiatrists in state institutions are underpaid and have too great a caseload."[25] In the

[24]These and similar contemporary techniques of behavioral control are discussed in detail in Note, *Conditioning and Other Technologies Used to "Treat?" "Rehabilitate?" "Demolish?" Prisoners and Mental Patients* (1972) 45 So.Cal.L.Rev. 616, 621-640. (See also Burt, *Of Mad Dogs and Scientists: The Perils of the "Criminal-Insane"* (1975) 123 U.Pa.L.Rev. 258, 263-273.)

[25]The practical barriers to adequate treatment of sex offenders in a correctional institution were described in a statement presented to the subcommittee by Dr. David G. Schmidt, chief psychiatrist at San Quentin. Dr. Schmidt's firm position was that "prison is a poor place to treat sick patients." (*Id.* at p. 171.) For a variety of reasons, he explained, the setting is inappropriate and largely counter-productive. Civilian personnel "may castigate these patients that have emotional problems, as nuts, and fruits, and sex fiends," and "one sadistic official often destroys the work of a dozen officers." (*Id.* at pp. 171, 172.) Similarly, "the general prison population is much less accepting, much less tolerant of patients and men that are not well physically or mentally than are the general population. This puts more pressure on these offenders who are proverbially the ones that get into sexual difficulties because of pressure and rigidity, because of a sense of inferiority, prison generally makes this sense of inferiority worse, develops more insecurity feelings in the individual, segregation may be necessary." (*Id.* at p. 172.) But "segregation alone without treatment is futile, fixates the aberrated even more" (*ibid.*). Nor is vocational or industrial therapy a realistic alternative: "Since these men often lack initiative, they lose out of hobby and craft activities and positions that are more desirable, such as office work, positions in industry with prison pay. They also come out on the tail-end often on recreation and other privileges" (*id.* at p. 171); "there is comparatively little work in the prison for psychotics and sex offenders that have large emotional or mental problems and they are often relegated to such idle tasks as yard sweeping . . . which lessens their chances for recovery and rehabilitation." (*Id.* at p. 172.) To further compound these difficulties, "Unfortunately we have not had sufficient staff to give each offender more than approximately two hours of individual treatment or an

light of this evidence the subcommittee concluded (*ibid.*) that "There is very little in the way of successful treatment available for persons who are committed as 'sexual psychopaths.' " (Accord, Final Rep., Cal. Sexual Deviation Research (Dept. Mental Hygiene 1954) p. 91.)

With this background we may now focus more sharply on current institutional practices in California. We are fortunate to have recent formal statements of policy by two responsible officials explaining the nature and purpose of the confinement of mentally disordered sex offenders in the California Men's Colony. The statements are by Dr. Sterling W. Morgan, then medical director of Atascadero State Hospital, and Harold V. Field, then superintendent of the California Men's Colony.[26] Dr. Morgan advises (at p. 4) that "A person determined to be a mentally disordered sex offender is considered to be amenable to treatment within the facilities of the Department of Mental Hygiene *if he recognizes that he has a problem,* indicates a desire for help, and cooperates in treatment programs offered at Atascadero. Such persons are retained at Atascadero State Hospital for treatment of their disorder.

"Conversely, *someone who does not think that he has a problem,* or who does not want help, or who cannot participate in or benefit from our treatment program because his predisposition towards violence renders him primarily a custodial problem,[27] is not considered amenable. He is sent back to the superior court as a person who is a mentally disordered sex offender but not amenable to treatment in order that he may *either be sentenced as a felony offender or placed in a treatment unit within some facility of the Department of Corrections*[28] as a mentally disordered sex offender." (Italics added.)

---

hour and a half of individual and approximately 10 hours of group therapy *each year.*" (Italics added; *id.* at p. 172.) In a classic understatement, Dr. Schmidt acknowledged that 10 hours of group therapy and an hour and a half of individual therapy *per year* "is much less than a minimum treatment for these problems." (*Id.* at p. 174.)

[26]The statements, made under penalty of perjury, were filed with this court by the Attorney General in the case of In re Abney on Habeas Corpus, Crim. 15112, as exhibits to his response to a petition raising issues substantially identical to those now before us.

[27]Feagley obviously presents no such problem. His Atascadero report stated that he "is very quiet, spends most of his time just sitting around," and listed no behavioral incidents. His California Men's Colony report stated that his disciplinary record was "clear," he was "exceptional in attitude toward authority" and above average in emotional stability, and concluded: "Feagley is a very polite and neat individual. He is no problem in the unit and you hardly know he's around. He spends most of his leisure time in his room reading and watches some TV. He has good associates."

[28]The significance of this alternative will be made clear later in this opinion.

In turn, Mr. Field states (at p. 1) that "The role of the California Men's Colony in dealing with mentally disordered sex offenders who are sent there as unamenable to treatment in a state hospital is to provide *the same facilities and the same treatment opportunities* to them as are provided for other men committed by the courts as the result of felony convictions" (italics added), with certain differences in the matter of review. "At least annually" the case of each mentally disordered sex offender is reviewed for the "primary purpose" of determining whether he might have become "amenable" to treatment at Atascadero. "If, on the other hand, subject is found to still be *resistive* or unamenable to treatment, the recommendation is made to the Director of Mental Hygiene that his *incarceration* in the correctional institution be continued." (Italics added; p. 2.) Leaving no doubt whatsoever in the matter, Mr. Field concludes (at p. 3) that "In summary, the California Men's Colony is a correctional institution and not a mental hospital per se. We do however, devote considerable effort and considerable professional staff time in attempting to *motivate* these mentally disordered sex offenders towards the recognition of the fact that they have a sexual problem, that *the way out* is through their understanding this fact and profiting from the treatment available. The *only* treatment modality available to them here is through group counseling and limited individual counseling by both our psychiatric and correctional staff. [29] The specialized professional treatment milieu and program for these

---

[29]Even this statement may be overoptimistic. The report of the California Men's Colony discloses that Feagley was found "not motivated" for academic instruction and "not academically qualified" for vocational instruction, and that his regular work assignment was in the prison knitting mill. His only other formal activity was a "group counseling" session led by a "Correctional Counselor I." Such sessions, occurring once a week for 75 minutes, constitute the sole "treatment" currently offered to mentally disordered sex offenders at the California Men's Colony (Santa Clara Note, p. 602), and the program is wholly voluntary (Inmate Classification Manual (Dept. Corrections) p. CL-IX-05, par. 3). A "Correctional Counselor I," of course, is not a medical professional; he is not even required to hold an undergraduate degree, but may qualify for the position with as little as one year's experience as a "correctional case work trainee." (State Personnel Bd. Specification, Rev. 10/4/73.) We have commented elsewhere on the inadequacy of group counseling as the exclusive treatment for sex offenders in a prison setting. (*In re Lynch* (1972) *supra*, 8 Cal.3d 410, 433-434.) Not the least of its defects is its tendency to produce only surface cooperation by the participants, who hope thereby to ingratiate themselves with the institutional authorities: "in a treatment setting where patients feel that only a certain type of response will be tolerated because any other leads to prolonged treatment—which also means prolonged incarceration for a period of several more years—no real remedy or cure for subtle, unconscious, repressed mechanisms can be expected, even under the most favorable conditions and the enthusiastic assistance of the professional personnel." (Hacker & Frym, *The Sexual Psychopath Act in Practice: A Critical Discussion* (1955) 43 Cal.L.Rev. 766, 774, fn. 14.) It is safe to say that the only "problem" undeniably solved by group therapy in prisons is the problem of too few therapists for too many inmates.

men is at the Atascadero State Hospital. We encourage and attempt to *motivate* the man to accept and be receptive of the Atascadero State Hospital treatment program." (Italics added.)

Turning to the record in the case at bar, we find further evidence that essentially the only "treatment" furnished to a mentally disordered sex offender at the California Men's Colony is incarceration until such time as he "recognizes his problem." At the commitment hearing the trial court asked "what kind of treatment they give to these people." The answer was provided by Raymond H. Faber, an experienced probation officer in charge of Feagley's case who had handled more than 150 mentally disordered sex offender matters during the previous 13½ years. Mr. Faber explained to the court that after entering the system through the California Medical Facility, "the defendant is then taken and placed in the Men's Colony in San Luis Obispo where they are fit into the program down there." He will receive "some type of minimal treatment" until "the notion strikes him that he wants to *recognize his problem*"; the defendant will then be transferred to Atascadero State Hospital, "where he can at that time *begin* hopefully treatment." (Italics added.) Mr. Faber concluded, "So basically, the Department of Corrections *really does not do anything* with these type of individuals, but leaves him at the Department of Mental Hygiene at a facility close by [i.e., the California Men's Colony, which is "close by" Atascadero State Hospital]." (Italics added.)

This is not treatment but coercion. It falls far short of the humane, therapeutic consideration which every person civilly committed has a right to expect in exchange for giving up his or her liberty. Even viewed sympathetically, the technique amounts to no more than a perverted form of "milieu therapy": the environment is used not for a constructive, positive purpose, but for a wholly negative effect—to make the inmate want to get out. The same can be said, of course, for any prison. Whatever the theory of such confinement, its reality is therefore indistinguishable from penal custody.

This fact was clearly perceived by the Supreme Court of Michigan in the leading case of *In re Maddox* (1958) 351 Mich. 358 [88 N.W.2d 470]. In *Maddox* a civilly committed sexual psychopath was transferred from the state mental hospital at Ionia to a state prison; there his conditions of custody were essentially the same as those of ordinary felony inmates, except for a medical review of his case every six months. He challenged the constitutionality of this confinement, presenting the issue "whether

or not defendant on this record may be said to be receiving treatment 'in an appropriate state institution' within the meaning of the statute" (*id.* at p. 474). Four psychiatrists were called as witnesses for the state, and each testified that the defendant's incarceration "was in and of itself a form of treatment which, at least on some occasions, helped to make obdurate criminal sexual psychopaths more ready to accept the treatment and assistance toward recovery offered by Ionia State hospital to which they might be returned." (*Ibid.*)

The *Maddox* opinion recalled that "The reason for our Court having previous to this time held that the criminal sexual psychopath act was constitutional was solely because it was interpreted as a civil and noncriminal proceeding. The origin and history of the act makes plain that this was its intention." (*Ibid.*) Reviewing that history, the court stated (at p. 475): "Clearly then, in design and purpose and interpretation, we have a statute which purports to represent civil commitment for *treatment* due to a mental state or condition. And our courts have upheld the civil and noncriminal procedures of the statute in direct relationship to its stated purpose and to the *treatment* contemplated." (Italics added.) The court then turned to the evidence before it, describing it as follows: "The hard fact posed by our current case is, that we are faced by a record which shows that a person committed under this remedial and corrective legislation for hospitalization and treatment is, in fact, serving potentially a life sentence in our biggest State prison, treated in all respects similarly to other criminals therein confined." (*Ibid.*)

This sequence of events, ruled the Michigan court, deprived the defendant of due process of law: "This Court holds that incarceration in a penitentiary designed and used for the confinement of convicted criminals is not a prescription available upon medical diagnosis and order to an administrative branch of government." (*Id.* at p. 476.) Moreover, "the violations of defendant's constitutional rights may well have had an important practical effect upon his treatment and rehabilitation also." (*Ibid.*) Emphasizing that the defendant was held in state prison largely because he refused to "recognize his problem" by admitting other sex crimes he was alleged to have committed, the court concluded (at p. 477): "In the event that defendant were actually innocent of the offenses charged (and on this record we have no right to presume the contrary), *his right to proper medical treatment* would have been as badly violated by his imprisonment as his constitutional rights." (Italics added.) (Accord, *Commonwealth* v. *Page* (1959) *supra,* 159 N.E.2d 82, 85, and cases cited.)

When the "incentive" rationalization for this confinement is stripped away, as it must be, nothing remains but bare incarceration "for the protection of society." Once again the record of the case at bar amply supports this conclusion. First, in the evaluative portion of Feagley's probation report Mr. Faber advised the court, "It is the opinion of this officer that hospitalization or treatment of any type will be of little or no value to this defendant and that when we talk of placing him in a mental hospital *it is merely for 'housing.'*" (Italics added.)[30] Nevertheless the officer recommended that "if in the opinion of the Court, the defendant does constitute a menace then he should be committed to the Atascadero State Hospital."

The policy behind this apparent inconsistency is exposed in the diagnostic report on Feagley prepared by Atascadero: after certifying him to be a mentally disordered sex offender, the document recites that "This man cannot utilize treatment but is still a danger to society and should not be provided additional opportunity to victimize others. He should be returned to the criminal court for action. We recommend that he be sentenced for the criminal act if sentencing is mandatory or if he is charged with a felony. [¶] *If he is charged with a misdemeanor,* I recommend that he be committed to the Department of Mental Hygiene for an indeterminate period and sent to the Reception and Guidance Center, California Medical Facility, Vacaville, California, in compliance with Section 6316 of the Welfare and Institutions Code. . . ." (Italics added.)

This language, which is consistent with the statement of the medical director of Atascadero quoted hereinabove, is revealing in two respects. First, it draws a sharp distinction between two classes of mentally disordered sex offenders: those whose underlying crime was a felony, and those—including Feagley—who were merely misdemeanants. As to the former it recommends sentencing on the criminal charge as an adequate disposition, but as to the latter it does not. The clear implication is that a misdemeanor sentence is deemed too brief, i.e., that it would not keep Feagley behind bars long enough to insure that he never again have an "opportunity to victimize others." Instead, therefore, the report recommends that he be committed "for an indeterminate period" to an institutional unit provided by section 6316—despite the announced fact that "This man cannot utilize treatment." The only

---

[30]The officer further noted that throughout the 11 years Feagley previously spent in state prison the doctors "continually" stated that he would not benefit from further treatment.

possible intent expressed thereby is that Feagley be confined indefinitely in a state prison unit not in order to treat him but as a "safer" alternative to a misdemeanor sentence in county jail.

The second significant aspect of this portion of the Atascadero report is that apart from the specification of the particular reception-guidance center to which the subject should be delivered, *the entire passage quoted above is a printed form.*[31] It follows that the recommendation in Feagley's case must have been a routine application of a settled institutional policy.[32] If that policy is likewise followed by the trial courts, one would expect to find a greater proportion of misdemeanants than felons committed to "institutional units" under sections 6316 and 6326. And that is precisely what the official statistics show: during the years 1966 to 1970, 23.9 percent of the mentally disordered sex offenders originating from the lower courts were committed to the California Medical Facility, compared with only 10.6 percent of the superior court cases. (The Mentally Disordered Sex Offender in California (Bureau Crim. Statistics) p. 34.)[33] That misdemeanant mentally disordered sex offenders are being confined in prison units at *more than double* the percentage rate of felon mentally disordered sex offenders speaks eloquently of the true nature and purpose of this commitment.[34]

---

[31]At the commitment hearing the court complained of this fact, characterizing the Atascadero report as a "mimeographed" and "very minimum-grade form letter" which furnished no explanation as to why Feagley was found to be not treatable in the state hospital.

[32]An identical recommendation was made, for example, in *In re Brown* (1969) *supra*, 275 Cal.App.2d 537, 539.

[33]Not surprisingly, persons so committed spent almost three times as long in custody as those committed to a state hospital. (*Ibid.*)

[34]In *In re Davis* (1973) 8 Cal.3d 798 [106 Cal.Rptr. 178, 505 P.2d 1018], we adopted the rule of *Jackson* v. *Indiana* (1972) *supra*, 406 U.S. 715, that no person charged with a criminal offense and committed to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future. We recognized that if no such likelihood appears, the trial court may nevertheless initiate alternative commitment proceedings; but we warned (at p. 807) that "Obviously, if a defendant is charged only with a minor misdemeanor a lengthy commitment to state hospital normally would be unjustified." Our guiding principle, also adopted from *Jackson*, was that "due process demands that the duration of commitments to state hospitals must bear some reasonable relation to the purpose which originally justified the commitment." (*Id.* at p. 805.) Applying that principle, we find it evident that indefinite confinement of misdemeanant mentally disordered sex offenders in order to "keep them off the streets" bears no relation whatever to the purpose which originally justified their commitment, and hence deprives them of due process under both *Jackson* and *Davis*.

Finally, the conclusions we have here drawn were articulated by the deputy district attorney representing the People in the case at bar. At a hearing on a motion by Feagley to withdraw his guilty plea, the prosecutor took pains to insure that defense counsel had understood "if Mr. Feagley was returned from Atascadero and found to be a mentally disordered sexual offender, but not amenable to treatment, that he then would face *a lengthy period of incarceration* in the Department of Mental Hygiene?" (Italics added.)

Again, at the outset of the jury trial the prosecutor argued vigorously against allowing the jury to hear any testimony on the issue whether Feagley could benefit from treatment. In support of his position, the prosecutor stated to the court: "Now, if the jury were to be presented with questions or information which would enable them to know that the defendant might be facing the rest of his life in the Department of Hygiene *under circumstances where he would be receiving substantially no treatment, which is possible, as the Court is well aware;* they might look at this question of whether he is a mentally disordered sex offender quite differently." (Italics added.) The prosecutor reiterated, "I think it would be a disastrous decision if the jury . . . are permitted to speculate on how many years he may do and whether he is going to be given any treatment," and concluded flatly, "This man has been sent back [from Atascadero] not amenable to treatment. So he has actually been found to be a mentally disordered sex offender at least for the present time. *He doesn't receive treatment.*" (Italics added.)

In *In re Bevill* (1968) *supra,* 68 Cal.2d 854, 861, Justice Peters prophetically observed of the mentally disordered sex offender that "should the rehabilitative ideal fail of fruition, he faces life imprisonment in a penal institution." We have now been shown the failure of that ideal insofar as mentally disordered sex offenders found to be untreatable in a state hospital are concerned. "For a prisoner who has been officially declared to be both dangerous and not treatable, the prospects of proving a recovery are bleak. The practical effect of the civil commitment may be life imprisonment without possibility of parole." (*In re Kramer* (1967) 257 Cal.App.2d 287, 291 [64 Cal.Rptr. 686].) For the reasons stated herein, we conclude there is ample evidence that mentally disordered sex offenders committed or recommitted to "institutional units" pursuant to sections 6316 or 6326 "are incarcerated in penal institutions among the general prison population" and "are customarily detained without treatment." (*In re Gary W.* (1971) *supra,* 5 Cal.3d 296, 302.) Under that decision and the constitutional

authorities cited herein, the statutory scheme providing for such confinement violates the cruel and unusual punishment clauses of both the California and federal Constitutions.

Consistent with those guarantees, the state may not involuntarily confine a civilly committed mentally disordered sex offender for an indefinite period in a prison setting. But the public is not thereby exposed to danger. If the offender is found to be unamenable to treatment, the statute directs that he be "returned to the court in which the criminal charge was tried to await further action with reference to such criminal charge. Such court shall resume the proceedings and shall impose sentence or make such other suitable disposition of the case as the court deems necessary." (§ 6316; see also §§ 6326, 6327.) The parameters of that sentence or disposition, of course, are fixed by the elected representatives of the people. █ And inasmuch as a well-known purpose of punishment is "to confine the offender so that he may not harm society" (*In re Estrada* (1965) 63 Cal.2d 740, 745 [48 Cal.Rptr. 172, 408 P.2d 948]), we must presume that the term of imprisonment prescribed by the Legislature for the underlying crime committed by such a mentally disordered sex offender is adequate to protect society against a potential recurrence of his conduct.

In view of our disposition herein, it is unnecessary to reach Feagley's additional contentions.

The order appealed from is reversed.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**BURKE, J.**\*—I dissent, on three separate grounds. First, for the reasons set forth in my dissenting opinion in *People* v. *Burnick, ante,* p. 306 [121 Cal.Rptr. 488, 535 P.2d 352], the use of a "beyond a reasonable doubt" standard in MDSO cases is unnecessary and unwise. Nor does the fact that defendant Feagley was ultimately ordered committed to a special treatment facility on prison grounds alter the "civil" nature of his commitment. As I explain below, Feagley was confined for purposes of *treatment, not punishment,* and the record in this case does not establish that he has been denied such treatment. Second, since Feagley was committed for purposes of treatment, there is absolutely no basis whatever for holding, as the majority do, that such confinement is

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

unconstitutional for lack of treatment. This issue plainly is not before us in this direct appeal from an order of commitment. Finally, as set forth below, I do not believe that constitutional principles require that Feagley be found to be an MDSO by the unanimous vote of all jurors. After briefly reviewing the facts, I consider each point seriatim.

In April 1970 defendant was convicted of misdemeanor battery (Pen. Code, § 242) following his plea of guilty to that charge. Pursuant to law (Welf. & Inst. Code, § 6302 et seq.)[1] defendant was certified to the superior court for a hearing to determine whether he was a mentally disordered sex offender ("MDSO"). In May 1970, acting on the basis of psychiatric testimony, the court found that defendant was an MDSO and ordered him committed to Atascadero State Hospital for a period of not more than 90 days, for the purpose of observation, diagnosis and recommendation to the court. (See former § 6316; under a 1970 amendment, the 90-day diagnostic period was deleted from the section.)

Subsequently, in July 1970, Atascadero officials advised the court that defendant was a mentally disordered sex offender who was a danger to the health and safety of others, and that defendant was not amenable to treatment in a state hospital. These officials recommended that defendant be sentenced and, if he were convicted of a misdemeanor, that he be committed for an indeterminate period to the California Medical Facility at Vacaville, for custodial care and treatment at an institutional unit under the jurisdiction of the Department of Corrections. (See §§ 6316, 6326.)

Thereafter, in October 1970, the court held a second hearing and found that defendant was an MDSO who was a danger to the health and safety of others and who was not amenable to treatment at state hospital. The court, *acknowledging defendant's need for "active involvement" in an institutional treatment program,* accepted the recommendation of Atascadero officials that defendant be committed to the California Medical Facility. Thereupon, defendant demanded a jury trial of the question of his status as an MDSO, as provided in section 6318. At the trial of this issue the jury, by a nine to three verdict, found that defendant was an MDSO and once again the trial court ordered defendant committed indefinitely to the California Medical Facility. The record indicates that defendant was retained at this facility for a short time and then transferred to California Men's Colony in San Luis Obispo County, a state prison

---

[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

("medium security institution") under the jurisdiction of the Department of Corrections (Pen. Code, §§ 2046, 5003). Subsequently, defendant was declared to be no longer a danger to others and was ultimately released on probation.

### 1. *Standard of Proof*

In my dissent in *People* v. *Burnick, supra, ante,* page 306, I suggest that the "beyond a reasonable doubt" standard of proof required in criminal cases is inappropriate in MDSO proceedings, since these proceedings are essentially civil in nature, and conducted with a view toward predicting whether the defendant is likely to be dangerous to others by reason of a predisposition to commit sexual offenses. As I explained, we cannot reasonably expect the trier of fact to determine this complex medical and psychiatric question on the basis of a determination beyond all reasonable doubt; of necessity, doubts accompany any attempt to predict human behavior.

The majority suggest, however, that this rationale should not control here, since Mr. Burnick was committed to, and remained at, Atascadero, a state hospital, whereas defendant was found unamenable to treatment at Atascadero and was ultimately committed to a treatment facility on prison grounds. Evidently, the majority assume that Feagley's commitment, accordingly, was a penal one and that he was therefore entitled to the procedural safeguards attendant to an ordinary criminal trial.

The majority misconstrue the intent and effect of the MDSO commitment process. The entire thrust of the statutory provisions is aimed at providing appropriate *treatment* for the MDSO. Under section 6316, the court may commit him to a state hospital if he is amenable to treatment there. If, however, he is not amenable to treatment at a state hospital, the court can commit him "for an indefinite period to the State Department of Health for placement in a state institution or institutional unit *for the care and treatment* of mentally disordered sex offenders designated by the court and provided pursuant to Section 6326." (Italics added.) Under section 6326, the Director of Health "may provide on the grounds of a state institution or institutions under the jurisdiction of the Department of Corrections or the State Department of Health one or more institutional units to be used *for the custodial care and treatment* of mentally disordered sex offenders." (Italics added.) California Men's Colony, where defendant was transferred, contains such an institutional treatment unit.

Thus, the mere fact that defendant was committed to a special institutional facility located on prison grounds rather than to a state hospital does not ipso facto convert the prior commitment proceedings from "civil" to "criminal." To the contrary, the Legislature has expressly provided that "mentally disordered persons are to be regarded as patients to be provided care and treatment and not as inmates of institutions for the purpose of secluding them from the rest of the public." (§ 4132.) Moreover, ". . . as far as possible and consistent with the rights of persons subject to commitment, such persons shall be treated, not as criminals, but as sick persons." (§ 6250.) The foregoing provisions, coupled with the language of sections 6316 and 6326, make it clear that all MDSO commitments are made for the purpose of the care and treatment of the offender, rather than the imposition of additional punishment upon him.

A case close on point is *In re Cruz,* 62 Cal.2d 307 [42 Cal.Rptr. 220, 398 P.2d 412], involving the analogous narcotic addict commitment procedures (§ 3000 et seq.). Cruz was first committed to a minimum security facility at the California Rehabilitation Center, but was subsequently transferred to a prison narcotics treatment facility, also located at California Men's Colony. As in the instant case, Cruz contended that his commitment amounted to "imprisoning" him "as a criminal," a procedure assertedly unconstitutional under *Robinson* v. *California,* 370 U.S. 660, 667 [8 L.Ed.2d 758, 763, 82 S.Ct. 1417]. In spite of the fact that Cruz was "housed among felons imprisoned for all types of offenses," we upheld the validity of the commitment.

We noted in *Cruz* that institutions such as the Rehabilitation Center are minimum security institutions and that sound security precautions may require a commitment to a more secure environment, such as a state prison facility. Nevertheless, as we explained in *In re De La O.,* 59 Cal.2d 128, 137-138 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705], ". . . it does not follow . . . that *all* persons who are delivered 'into the custody of the Director of Corrections' are necessarily defendants under a judgment of imprisonment in a state prison, or that confinement is a penal restraint." Commitment to a special rehabilitation facility on prison grounds may not be considered a "penal restraint" if the purpose for the commitment is rehabilitation and treatment, rather than punishment. (Accord, *In re Gary W.,* 5 Cal.3d 296, 301-303 [96 Cal.Rptr. 1, 486 P.2d 1201] [juvenile commitment to Youth Authority].)

By a parity of reasoning, I would conclude the defendant's commitment to California Men's Colony was a "civil" commitment despite the

fact that the facility is located on prison grounds. By definition, an MDSO is a person who has committed, and been convicted of, at least one criminal offense, and has also been found presently dangerous to others. The security problems inherent in providing for the care and treatment of such persons are substantial and justify the existing provisions (§§ 6316, 6326) for the commitment to special prison facilities of MDSOs who are found unamenable to treatment at state hospitals. (See *In re Cathey*, 55 Cal.2d 679, 690-691 [12 Cal.Rptr. 762, 361 P.2d 426].)

Thus, in the absence of proof that defendant has not received the "care and treatment" to which he is entitled, we must assume that his commitment was, and remained, "civil" in nature.[2] Accordingly, I would hold that defendant was not entitled to the benefit of the "beyond a reasonable doubt" standard of proof.

## 2. *Lack of Treatment*

As I indicate above, a major justification for the indefinite commitment of MDSOs is to provide opportunities for their treatment. The majority maintain that since Feagley was found unamenable to treatment, and has received no treatment, his commitment is in fact a "penal" one. (See *Robinson* v. *California, supra,* 370 U.S. 660, 667, prohibiting punishment of persons solely by reason of their status as addicts.)

First of all, it is clear that defendant has never been found incurable or permanently unamenable to treatment. The trial court's finding, based upon the report and recommendation of Atascadero officials, was that he was presently unamenable to treatment *at a state hospital.* As I noted above, the trial court expressly acknowledged the availability of, and need for, treatment at an institutional facility under the jurisdiction of the Department of Corrections. A finding of unamenability at Atascadero, a minimum security hospital, does not preclude a finding of amenability at an institutional facility. (See *In re Cruz, supra,* 62 Cal.2d 307; *In re Cathey, supra,* 55 Cal.2d 679.) It should also be noted that an MDSO committed for treatment at an institutional facility might so

---

[2] For cases holding that MDSO commitments are essentially "civil" despite the possibility of confinement on prison grounds, see *In re Bevill,* 68 Cal.2d 854, 858 [69 Cal.Rptr. 599, 442 P.2d 679]; *In re De La O., supra,* 59 Cal.2d 128, 139, and cases cited; *People* v. *Rancier,* 240 Cal.App.2d 579, 581-585 [49 Cal.Rptr. 876]; *People* v. *Barzee,* 213 Cal.App.2d 139, 141 [28 Cal.Rptr. 692]; *People* v. *Levy,* 151 Cal.App.2d 460 [311 P.2d 897].

improve as to become amenable to treatment at a state hospital. For example, despite his commitment to a prison treatment unit, the defendant in this case improved sufficiently to justify his release to society.

Moreover, the present record fails to establish that defendant failed to receive the treatment which, under the law (§§ 6316, 6326), must be provided to him. We must keep in mind that the instant case involves a direct appeal from a judgment of commitment; the facts regarding defendant's subsequent treatment are not a part of the record. In the absence of facts of record disclosing the invalidity of defendant's initial commitment, the proper remedy for one asserting a failure to receive adequate treatment is to seek habeas corpus. As we stated in *In re Gary W., supra,* 5 Cal.3d 296, 303, involving an indefinite commitment of a juvenile to the Youth Authority, ". . . the Youth Authority is under an affirmative obligation to provide treatment for the ward's mental or physical abnormality when he is committed pursuant to [§§ 1800-1803]. Detention of such wards without treatment is unauthorized by statute. Accordingly, any person confined pursuant to a section 1800 commitment, but who is not receiving treatment may seek his release through appropriate habeas corpus procedures. [Citations.]"

It is uncontradicted that defendant and other MDSOs committed to an institutional unit at California Men's Colony do receive group counseling and therapy by psychiatric and correctional staff.[3] In view of the fact that defendant's own commitment has terminated, I see no purpose in speculating regarding the effectiveness of the treatment presently received by others in his position. As indicated above, such persons may

---

[3]Defendant has asserted that he was confined in the "D Quad" of the East Wing of California Men's Colony, a cell block used especially for the incarceration of MDSOs. According to defendant, he "mingle[d] freely with the general prison population," wore the usual prison attire, worked in the prison knit shop, was subject to prison "scrutiny and censorship" of his mail as well as all other prison regulations regarding security, and was deprived of rights and privileges made available to MDSOs committed to state hospitals. None of these assertions were properly part of the record on appeal.

As I have explained above, security considerations may require that persons confined to a prison treatment facility forego some of the privileges available to patients at a state hospital. (See *In re Cruz, supra,* 62 Cal.2d 307, 316-317, reviewing the narcotics addict treatment facilities available at Men's Colony East, and upholding the commitment as "civil" despite the fact that the 46 addicts in that facility were housed together with the other prison inmates.) However, under the statutes set forth above, MDSOs committed to a prison treatment unit (and all other persons subject to commitment) "as far as possible and consistent with the rights of persons subject to commitment . . . shall be treated, not as criminals, but as sick persons." (§ 6250.) Accordingly, the remedy of application for a writ of habeas corpus remains available for any person who believes himself to be unreasonably and unnecessarily denied the rights and privileges accorded to patients in a state hospital.

at any time initiate habeas corpus proceedings to challenge the adequacy of the treatment they are receiving.[4]

### 3. *Unanimous Jury Verdict*

Under section 6321, the concurrence of three-fourths of the jurors is sufficient to determine a defendant's status as an MDSO. The majority point out that ordinary civil commitments under the Lanterman-Petris-Short Act (§ 5000 et seq.) require a *unanimous* jury verdict. (§ 5303.) They rely upon *Baxstrom* v. *Herold,* 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760], and *Humphrey* v. *Cady,* 405 U.S. 504 [31 L.Ed.2d 394, 92 S.Ct. 1048], and contend that the failure to provide Feagley with the protection of a unanimous verdict is arbitrary and denies him equal protection of the laws. I disagree.

First of all, neither the *Baxstrom* nor *Humphrey* case is on point. *Baxstrom* held that a convicted prisoner who had completed his sentence could not be held in confinement for additional, compulsory treatment without affording him a jury trial. *Humphrey* held that Wisconsin's sex offender commitment statutes offended equal protection principles by denying defendant a pre-commitment jury trial. Both cases agree that a person's status as a prior criminal offender does not of itself justify denying him the fundamental right of trial by jury, a right provided to other persons sought to be committed as dangerous to society. Neither case, however, touches upon the question whether the state may, in bestowing that right, require less than a unanimous verdict to commit an MDSO.

On the other hand, this court has recently made it clear that the three-fourths verdict procedure (which is now applicable to several specialized commitments, including MDSO, narcotics addict, and juvenile court ward commitments) does not offend equal protection principles. We stated that "although the procedures leading to the

---

[4]We have noted that with respect to certain mentally disordered persons, it may be "inappropriate to place upon such persons the burden of initiating proceedings . . ." to secure habeas corpus relief. (*In re Davis,* 8 Cal.3d 798, 806-807, fn. 6 [106 Cal.Rptr. 178, 505 P.2d 1018].) We suggested in *Davis* that the hospital authorities should have the obligation to report periodically to the courts regarding the status of persons committed as incompetent to stand trial in a criminal case (Pen. Code, § 1370). A similar procedure is available with respect to the MDSO. A statutory provision empowers the trial court to require hospital authorities "to make periodic reports to the court concerning the person's progress towards recovery." (§ 6317.) Likewise the court would have the inherent power to order periodic reports of this nature by the persons in charge of institutional facilities located on prison grounds. The trial courts should utilize this procedure whenever a doubt arises regarding the ability of the person committed to seek habeas corpus relief.

commitment of various classes of people for treatment or to protect society from them need not be identical in all respects, none may deny to one such class fundamental rights or privileges accorded to another unless a rational basis for the distinction exists. Thus we must evaluate the procedures adopted to implement sections 1800-1803 [provisions permitting the extended commitment of Youth Authority wards beyond their normal release date] in light of other statutory provisions governing involuntary commitment. [Citation.]" (*In re Gary W., supra,* 5 Cal.3d 296, 304.) In the foregoing case, we noted that although ordinary civil commitments required a unanimous jury, "We deem the commitment of Youth Authority wards under section 1800 to be most closely analogous to the civil commitment procedures for suspected mentally disordered sex offenders and narcotics addicts, each of which classes are entitled to a jury trial and a three-fourths verdict. Appellant is entitled to a jury trial in like manner as is made available to those classes." (P. 308.)

It must be kept in mind that, unlike the person sought to be civilly committed under the general provisions of the Lanterman-Petris-Short Act, defendant had already been convicted of a criminal offense, and had (following a full judicial hearing) been adjudged an MDSO by the trial court. As we recently pointed out in *In re Franklin,* 7 Cal.3d 126, 137-144 [101 Cal.Rptr. 553, 496 P.2d 465], persons who have already demonstrated criminal behavior may fall within a "special class," thereby affording a rational basis for treating them differently from other persons. Although principles of equal protection may require that a jury trial be provided to all persons sought to be committed, defendant's special status justified the three-fourths verdict procedure, a procedure which formerly was employed in *every* civil commitment.[5]

I would affirm the order of commitment.

McComb, J., and Clark, J., concurred.

Respondent's petition for a rehearing was denied June 11, 1975. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

---

[5]The three-fourths verdict provision originally applied to all civil commitments of mentally disordered persons. (See, e.g., former Pol. Code, § 2174; *In re Shackleford,* 188 Cal. 279 [204 P. 822]; cf. art. I, § 16, Cal. Const. ["in civil actions three-fourths of the jury may render a verdict"].) It was not until 1967 that the Legislature, in enacting the Lanterman-Petris-Short Act, made provision for a unanimous jury verdict in ordinary civil commitments. (§ 5303.) The Legislature retained, however, the three-fourths verdict in such special situations as MDSO proceedings (§ 6321) and narcotic addict commitment proceedings (§ 3108), both of which involve "rehearings" by a jury of prior court-ordered commitments.